No. 14-15139

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CITY OF SAN JOSÉ; CITY OF SAN JOSÉ AS SUCCESSOR AGENCY TO THE REDEVELOPMENT AGENCY OF THE CITY OF SAN JOSÉ; and THE SAN DIRIDON DEVELOPMENT AUTHORITY,

Plaintiffs and Appellants,

v.

OFFICE OF THE COMMISSIONER OF BASEBALL, an unincorporated association dba Major League Baseball; and ALLAN HUBER "BUD" SELIG,

Defendants and Appellees.

Appeal from the United States District Court
Northern District of California
The Honorable Ronald M. Whyte, Presiding
Case No. 5:13-cv-02787-RMW

## ANSWERING BRIEF OF DEFENDANTS AND APPELLEES

**KEKER & VAN NEST LLP**
JOHN W. KEKER, # 49092
PAULA L. BLIZZARD, # 207920
R. ADAM LAURIDSEN, # 243780
THOMAS E. GORMAN, # 279409
633 Battery Street
San Francisco, CA 94111-1809
Telephone:   415 391 5400
Facsimile:   415 397 7188

**PROSKAUER ROSE LLP**
BRADLEY I. RUSKIN
Eleven Times Square, NY, NY 10036
Telephone: 212-969-3000
Facsimile: 212-969-2900
SCOTT P. COOPER (SBN 96905)
SARAH KROLL-ROSENBAUM
   (SBN 272358)
JENNIFER L. ROCHE (SBN 254538)
SHAWN S. LEDINGHAM, JR.
   (SBN 275268)
2049 Century Park East, 32nd Floor
Los Angeles, California 90067-3206
Telephone: 310-557-2900
Facsimile: 310-557-2193

Attorneys for Defendants and Appellees

## CORPORATE DISCLOSURE STATEMENT

Under Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant

Office of the Commissioner of Baseball makes the following disclosure:

The Office of the Commissioner of Baseball d/b/a Major League Baseball

("MLB") is an unincorporated association and, as such, has no corporate parent.

There is no publicly held corporation that owns 10% or more of MLB.

Respectfully submitted,

Dated:  April 4, 2014                    **KEKER & VAN NEST LLP**

By:    /s/ John W. Keker
            JOHN W. KEKER
            PAULA L. BLIZZARD
            R. ADAM LAURIDSEN
            THOMAS E. GORMAN

            **PROSKAUER ROSE LLP**
            BRADLEY I. RUSKIN
            SCOTT P. COOPER
            SARAH KROLL-ROSENBAUM
            JENNIFER L. ROCHE
            SHAWN S. LEDINGHAM, JR.

            Attorneys for Defendants /Appellees
            OFFICE OF THE COMMISSIONER
            OF BASEBALL,
            an unincorporated association doing
            business as Major League
            Baseball; and ALLAN HUBER
            "BUD" SELIG

# TABLE OF CONTENTS

Page

Corporate Disclosure Statement ...........................................................i

Statement of Jurisdiction..................................................................1

Counter-Statement of Issues Presented.................................................3

Standard of Review.........................................................................5

Statement of the Case......................................................................6

Summary of the Argument................................................................10

Argument....................................................................................13

I.    Baseball's antitrust exemption bars San José's claims...........................13

      A.    The Supreme Court has repeatedly held that baseball is
            exempt from antitrust regulation. ....................................13

      B.    The antitrust exemption broadly applies to the "business
            of baseball." ...........................................................15

            1.    The Supreme Court exempted the "business of
                  baseball," not simply the "reserve clause."......................16

            2.    The Ninth Circuit—like many other circuit
                  courts—holds that the antitrust exemption applies
                  broadly to the "business of baseball." ............................19

            3.    San José asks this Court to reject binding
                  Supreme Court precedent and Ninth Circuit law
                  and to instead follow a widely criticized district
                  court opinion...................................................21

      C.    MLB's relocation rules are squarely within the antitrust
            exemption and factual discovery is unnecessary........................25

            1.    MLB's relocation rules, like other core issues of
                  league structure, are exempt from antitrust
                  regulation.....................................................25

            2.    San José never asked for discovery below, and the

scope of the exemption was properly decided without a developed record. ................................................ 27

D.    Congress has recognized the exemption's broad scope. .............. 29

II.    The state law antitrust and unfair competition claims were properly dismissed. ........................................................................ 32

    A.    San José's state law antitrust and unfair competition claims are preempted by the Supremacy Clause. ........................ 33

    B.    San José's state law claims are precluded by the Commerce Clause. ........................................................................ 34

    C.    San José's unfair competition claim fails to state a claim. ........................................................................................ 36

        1.    San José fails to allege an "unlawful, unfair, or fraudulent business act or practice." .................................. 36

        2.    San José lacks standing to assert an Unfair Competition Law claim. ..................................................... 38

III.    San José does not have antitrust standing. ................................. 39

    A.    San José lacks standing to seek damages under § 4 of the Clayton Act. ............................................................ 40

        1.    The Complaint fails to allege antitrust injury, which is an essential component of any claim under the Clayton Act. ....................................... 41

            a.    San José does not allege damage to "business or property" as required by the Clayton Act. ............................................................ 41

            b.    San José is not a participant in any cognizable market. ................................................... 43

            c.    San José's alleged injuries are not experienced in any cognizable market. .................... 46

        2.    San José has not yet sustained damages, and, at best, claims an injury that results *indirectly* from the alleged antitrust violation. ............................................ 47

a.    San José has not yet sustained damages. .................48

b.    San José's claimed injuries are "indirect" and "remote." ..........................................................49

3.    San José's claimed "harm" is completely speculative. ..........................................................51

4.    San José's claimed damages are potentially duplicative and subject to complex apportionment ....................................................52

B.    San José also lacks standing to seek equitable relief under § 16 of the Clayton Act. ....................................54

1.    San José cannot show a threatened antitrust injury. .................................................................55

2.    San José cannot show that its claimed injury would result proximately from MLB's allegedly wrongful acts. ..................................................55

IV.    Conclusion ........................................................................57

Certificate of Counsel Regarding Related Cases ................................59

Certificate of Compliance ...................................................60

Statutory and Legislative Addendum ...........................................61

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*
190 F.3d 1051 (9th Cir. 1999) ................................................................. passim

*Ashcroft v. Iqbal*
556 U.S. 662 (2009) ......................................................................................5

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*
459 U.S. 519 (1983) ............................................................................. passim

*AT&T Mobility LLC v. Concepcion*
131 S. Ct. 1740 (2011) .............................................................................. 34

*Atl. Richfield Co. v. USA Petroleum Co.*
495 U.S. 328 (1990) ................................................................................. 41

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007) ............................................................................ 5, 50

*Bigelow v. RKO Radio Pictures*
327 U.S. 251 (1946) ................................................................................. 53

*Blue Shield of Va. v. McCready*
457 U.S. 465 (1982) ............................................................................ 47, 50

*Burton v. Nationstar Mortg., LLC*
No. CV F 13-0307 LJO GSA, 2013 WL 2355524 (E.D. Cal. May 29, 2013) ...................................................................................... 37, 38

*California v. Steelcase, Inc.*
792 F. Supp. 84 (C.D. Cal. 1992) ............................................................ 39

*Cargill Inc. v. Monfort of Colo., Inc.*
479 U.S. 104 (1986) ................................................................ 40, 41, 48, 55

*Chapman v. New York State Div. for Youth*
546 F.3d 230 (2d Cir. 2008) .................................................................... 45

*Charles O. Finley & Co. v. Kuhn*
569 F.2d 527 (7th Cir. 1978) ...................................................... 13, 20, 22

*Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu*
626 F.3d 483 (9th Cir. 2010) .................................................................. 35

*City of Rohnert Park v. Harris*
601 F.2d 1040 (9th Cir. 1979) ...................................................... 55, 56, 57

*Cnty. of Santa Clara v. Astra U.S., Inc.*
428 F. Supp. 2d 1029 (N.D. Cal. 2006) ................................................. 38

*Daniels-Hall v. Nat'l Educ. Ass'n*
   629 F.3d 992 (9th Cir. 2010) ................................................................5

*DocMagic, Inc. v. Ellie Mae, Inc.*
   745 F. Supp. 2d 1119 (N.D. Cal. 2010)........................................ 37, 38

*Federal Baseball Club of Baltimore, Inc. v. Nat'l League of Prof'l*
   *Baseball Clubs*
   259 U.S. 200 (1922)................................................................... passim

*Ferguson v. Corinthian Colls., Inc.*
   733 F.3d 928 (9th Cir. 2013) .............................................................. 34

*Flood v. Kuhn*
   407 U.S. 258 (1972)................................................................... passim

*Forrester v. Am. Dieselelectric, Inc.*
   255 F.3d 1205 (9th Cir. 2001) ........................................................... 34

*Frontier Enters. v. Amador Stage Lines*
   624 F. Supp. 137 (E.D. Cal. 1985) .................................................... 28

*G & S Holdings LLC v. Cont'l Cas. Co.*
   697 F.3d 534 (7th Cir. 2012) ............................................................. 28

*Hale v. Brooklyn Baseball Club*
   Motion to Dismiss Hr'g (N.D. Tex. Sept. 19, 1958) ......................... 27

*Hawaii v. Standard Oil, Co.*
   405 U.S. 251 (1972)................................................... 41, 42, 52, 53

*Henderson Broad. Corp. v. Houston Sports Assoc.*
   541 F. Supp. 263 (S.D. Tex. 1982)............................................. 26, 27

*In re Brand Name Prescription Drugs Antitrust Litig.*
   123 F.3d 599 (7th Cir. 1997) ............................................................ 33

*In re Cell Tower Litig.*
   807 F. Supp. 2d 928 (S.D. Cal. 2011)............................................... 38

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*
   522 F.3d 6 (1st Cir. 2008)................................................................. 52

*Kowalski v. Chandler*
   202 F.2d 413 (6th Cir. 1953) ............................................................ 17

*LiveUniverse, Inc. v. MySpace, Inc.*
   304 Fed. App'x 554 (9th Cir. 2008) .................................................. 36

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*
   726 F.2d 1381 (9th Cir. 1984) ..................................................... 43, 45

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*
   791 F.2d 1356 (9th Cir. 1986) ............................................. 45, 46, 50

vi

*Lucas Auto. Eng'g v. Bridgestone/Firestone, Inc.*
   140 F.3d 1228 (9th Cir. 1998) ................................................ 54

*Major League Baseball v. Butterworth*
   181 F. Supp. 2d 1316 (N.D. Fla. 2001) ................................ 21, 22, 35

*Major League Baseball v. Crist*
   331 F.3d 1177 (11th Cir. 2003) ...................................... 21, 22, 26, 33

*McCoy v. Major League Baseball*
   911 F. Supp. 454 (W.D. Wash. 1995) ............................. 22, 28, 29, 50

*Morsani v. Major League Baseball*
   79 F. Supp. 2d 1331 (M.D. Fla. 1999) ..................................... 22, 30

*Mortensen v. Bresnan Commc'ns., LLC*
   722 F.3d 1151 (9th Cir. 2013) ................................................ 34

*Nat'l Basketball Ass'n v. SDC Basketball Club, Inc.*
   815 F.2d 562 (9th Cir. 1987) ................................................ 56

*National Credit Reporting Association v. Experian Information
   Solutions, Inc.*
   No. C04–01661 WHA, 2004 WL 1888769 (N.D. Cal. July 21,
   2004) ................................................................................... 37

*New Orleans Pelicans Baseball, Inc. v. Nat'l Ass'n of Prof'l Baseball
   Leagues, Inc.*
   No. 93-253, 1994 WL 631144 (E.D. La. Mar. 1, 1994) .......... 22, 25, 27

*Newcal Indus., Inc. v. Ikon Office Solution*
   513 F.3d 1038 (9th Cir. 2008) ......................................... 44, 45

*Pareto v. FDIC*
   139 F.3d 696 (9th Cir. 1998) ................................................. 5

*Parrish v. NFL Players Ass'n*
   534 F. Supp. 2d 1081 (N.D. Cal. 2007) .................................. 38

*Piazza v. Major League Baseball*
   831 F. Supp. 420 (E.D. Pa. 1993) ................................... 22, 23, 24

*Portland Baseball Club, Inc. v. Baltimore Baseball Club, Inc.*
   282 F.2d 680 (9th Cir. 1960) ................................................ 20

*Portland Baseball Club, Inc. v. Kuhn*
   491 F.2d 1101 (9th Cir. 1974) (per curiam) .................. 19, 25, 26, 28

*Postema v. National League of Professional Baseball Clubs*
   799 F. Supp. 1475 (S.D.N.Y. 1992) ..................................... 26, 27

*Prof'l Baseball Sch. & Clubs, Inc. v. Kuhn*
   693 F.2d 1085 (11th Cir. 1982) ...................................... 20, 26, 27, 28

*Radovich v. Nat'l Football League*
   352 U.S. 445 (1957) ..................................................... 14, 17, 20, 22

*Robertson v. Nat'l Basketball Ass'n*
  389 F. Supp. 867 (S.D.N.Y. 1975) ...................................... 35

*Salerno v. Am. League of Prof'l Baseball Clubs*
  310 F. Supp. 729 (S.D.N.Y. 1969), *aff'd*, 429 F.2d 1003 (2d Cir.
  1970) ...................................................................... 29

*Salerno v. Am. League of Prof'l Baseball Clubs*
  429 F.2d 1003 (2d Cir. 1970) ............................................ 21

*Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*
  476 U.S. 409 (1986) ...................................................... 31

*Stearns v. Ticketmaster Corp.*
  655 F.3d 1013 (9th Cir. 2011) ............................................ 5

*Toolson v. New York Yankees*
  101 F. Supp. 93 (S.D. Cal. 1951) ........................................ 17

*Toolson v. New York Yankees, Inc.*
  346 U.S. 356 (1953) ................................................. passim

*Triple-A Baseball Club Assocs. v. Ne. Baseball, Inc.*
  832 F.2d 214 (1st Cir. 1987) ............................................. 21

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*
  676 F.2d 1291 (9th Cir. 1982) ........................................... 19

*United States v. Corinthian Colls.*
  655 F.3d 984 (9th Cir. 2011) ........................................... 5, 6

*United States v. Int'l Boxing Club*
  348 U.S. 236 (1955) ...................................................... 14

*United States v. Shubert*
  348 U.S. 222 (1955) .............................................. 14, 16, 22

*Zixiang Li v. Kerry*
  710 F.3d 995 (9th Cir. 2013) ............................................ 27

**State Cases**

*Bradstreet v. Wong*
  161 Cal. App. 4th 1440 (2008) .......................................... 39

*Butterworth v. Nat'l League of Prof'l Baseball Clubs*
  644 So. 2d 1021 (Fla. 1994) ............................................. 22

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*
  20 Cal. 4th 163 (1999) .............................................. 36, 37

*Chavez v. Whirlpool Corp.*
  93 Cal. App. 4th 363 (2001) ............................................ 36

*Cmty. Mem'l Hosp. v. Cnty. of Ventura*
  50 Cal. App. 4th 199 (1996) ............................................ 38

812213

*Drum v. San Fernando Valley Bar Ass'n*
  182 Cal. App. 4th 247 (2010) .......................................................... 38

*Minn. Twins P'ship v. State ex rel. Hatch*
  592 N.W.2d 847 (Minn. 1999) ........................................................ 26

*Morsani v. Major League Baseball*
  663 So. 2d 653 (Fla. Ct. App. 1995)............................................... 22

*Partee v. San Diego Chargers Football Co.*
  34 Cal. 3d 378 (1983) ...................................................................... 35

*Stand For San José v. City of San José*
  No. 1-11-CV-214196 (Cal. Super. Ct. filed Dec. 2, 2011), No. 1-
  13-CV-250372 (filed July 30, 2013) ..................................... 7, 51, 56

*Wisconsin v. Milwaukee Braves, Inc.*
  144 N.W.2d 1 (Wis. 1966)........................................................ 26, 35

## Federal Statutes

15 U.S.C. § 15(a) ............................................................................... 48

15 U.S.C. § 15c ................................................................................. 57

15 U.S.C. § 26 ................................................................................... 54

15 U.S.C. § 26b ........................................................... 11, 15, 29, 30, 32

28 U.S.C. § 1291 ................................................................................. 2

28 U.S.C. § 1331 ................................................................................. 1

28 U.S.C. § 1367 ................................................................................. 1

## State Statutes

Cal. Bus. & Prof. Code § 17200 ...................................................... 36

Cal. Bus. & Prof. Code § 17201 ...................................................... 38

Cal. Bus. & Prof. Code § 17204 ................................................. 38, 39

Cal. Civ. P. § 526a ........................................................................... 56

Cal. Health & Safety Code § 34167.5 .............................................. 56

## Federal Rules

Fed. R. Civ. P. 12(b)(6)............................................................. 1, 5, 45

**Constitutional Provisions**

U.S. Const. Art. VI, cl. 2 ........................................................................ 33

**Other Authorities**

143 Cong. Rec. S379-01 (1997) ............................................................. 31

H.R. 386, 104th Cong. (1995) ................................................................ 32

S. 500, 103d Cong. (1993) ..................................................................... 32

## STATEMENT OF JURISDICTION

The District Court had federal question jurisdiction over San José's Sherman Act claim under 28 U.S.C. § 1331.  For San José's Cartwright Act and Unfair Competition Law claims, the District Court had federal question jurisdiction under § 1331 and/or supplemental jurisdiction under § 1367.  *See also* I Excerpt of Record ("ER") 164:21–165:14 & n.13.  After dismissing these claims on the merits, the District Court declined to exercise supplemental jurisdiction over San José's state law tort claims.  I ER 5–6.  San José admits that those tort claims are not part of this appeal.  *See* I ER 2 (Notice of Appeal); SJ Op. Br. at 7–10.

In its October 11, 2013 Order Granting-In-Part and Denying-In-Part Defendants' Motion to Dismiss Plaintiffs' Complaint Under Federal Rule of Civil Procedure 12(b)(6), the District Court dismissed San José's Sherman Antitrust Act, Cartwright Act, and Unfair Competition Law claims.  I ER 7–32.

On December 27, 2013, the District Court issued its Order Declining to Retain Supplemental Jurisdiction of State Law Claims, dismissing the two remaining state law claims for tortious interference with prospective economic advantage and tortious interference with contract.  I ER 5–6.

The District Court entered a final Judgment in favor of the Defendants on the Sherman Antitrust Act, Cartwright Act, and Unfair Competition Law claims on January 3, 2014.  I ER 3–4.  The District Court resolved all issues in the case,

1

concluding that "plaintiffs are entitled to no relief by way of their complaint."  I ER 4.

On January 23, 2014, San José timely filed its Notice of Appeal.  I ER 1–2. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

812213

## COUNTER-STATEMENT OF ISSUES PRESENTED

For over 90 years, the Supreme Court has held that the "business of baseball" is exempt from antitrust regulation.  The Supreme Court has refused to overturn this exemption and has instead expressly deferred to Congress.  Congress' only act in this area eliminated the exemption for specific labor issues, but preserved it for the rest of the business of baseball, including—explicitly— "franchise expansion, location or relocation."  The District Court dismissed San José's claims and thus the questions presented by San José's appeal are:

1. Whether the District Court was correct that the exemption covers the "business of baseball"—including franchise relocation.

2. Whether the District Court was correct that San José lacks antitrust standing because San José claims an indirect, speculative injury, or alternatively, whether San José lacks antitrust standing because its claimed injury is duplicative, subject to overly complex calculation, and does not flow from an alleged antitrust violation.

3. Whether the District Court was correct that San José's Cartwright Act claim is precluded by the Commerce Clause, or, alternatively, whether that claim must be dismissed under the Supremacy Clause.

4. Whether the District Court was correct that San José's Unfair Competition Law claim must be dismissed because it is based entirely on San José's illegitimate antitrust theory, or, alternatively, whether that claim must be dismissed under the Commerce Clause or the Supremacy Clause.

812213

## PERTINENT STATUTES AND LEGISLATIVE ACTIVITY

Pertinent statutes and legislative activity are included in an attached

Statutory and Legislative Addendum, which begins on page 61.

812213

## STANDARD OF REVIEW

A district court's order granting a motion to dismiss under Rule 12(b)(6) is reviewed *de novo*.  *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1018 (9th Cir. 2011).  To avoid dismissal, a plaintiff must allege facts showing that the "right to relief [rises] above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  A plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the Court must accept material factual allegations as true, pleadings that are "no more than conclusions, are not entitled to the assumption of truth."  *Id.* at 679; *see also Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998) ("conclusory allegations . . . and unwarranted inferences" are insufficient).  Furthermore, the Court need not accept the truth of any allegations that are contradicted by matters properly subject to judicial notice or by exhibits attached to the complaint. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010).  The Court "can affirm a 12(b)(6) dismissal on any ground supported by the record, even if the district court did not rely on the ground."  *United States v. Corinthian Colls.*, 655 F.3d 984, 992 (9th Cir. 2011) (internal citations and quotation marks omitted).

## STATEMENT OF THE CASE

In this action, San José challenges rules that are central to the operation of the business of Major League Baseball—rules governing the location and relocation of member baseball clubs.  I ER 62 (¶ 1).  This dispute involves the potential relocation of the Oakland Athletics baseball club to San José.  The Oakland Athletics are a member of Major League Baseball, whose 30 member clubs have all agreed to be governed by the Major League Constitution and the rules adopted and promulgated by MLB and the Commissioner of Baseball.  I ER 57 (Art. I); I ER 62 (Art. VI); I ER 72 (Art. XI, § 3).  As part of the league structure, each of the clubs plays its home games in an operating territory identified in the Major League Constitution.  *See* I ER 66–68 (Art VIII, § 8).  The Athletics' operating territory consists of Alameda and Contra Costa Counties in California, and the Athletics currently play home games in the O.co Coliseum in Oakland.  *Id.*; II ER 72 (¶¶ 46, 50).

The Athletics have considered possible alternative locations in which to play future home games.  II ER 86–87 (¶¶ 117–18).  These potential alternatives have included construction of a new ballpark in several locations, including Oakland, other communities in Alameda and Contra Costa Counties, and, most recently, San José.  *Id.*  The Major League Constitution and Major League Rules set forth the process for a club to obtain permission to relocate outside its current territory.  II

812213

ER 85–86 (¶¶ 108, 110).  Because San José is not within the Athletics' operating territory, a move to San José (and a change in the Athletics' operating territory) would be a relocation requiring approval by three-quarters of the Major League Baseball clubs.  I ER 61–62 (Art. V, § 2(b)(3)).

There is no stadium in San José capable of hosting Major League Baseball games.  *See* II ER 134.  San José has not offered to fund any part of the construction of a stadium.  In fact, in 2009, the San José City Council expressly resolved ***not*** to make any material economic commitment to either the potential relocation of the Athletics or the construction of a ballpark.  *See* II ER 219; *see also* I ER 184–86.  The only step San José did take toward a new stadium was to execute a contract with the Athletics in November 2011 that gave the Athletics a two-year ***option*** to purchase certain parcels of land that San José had purportedly transferred to the Diridon JPA (the "Option Agreement").  II ER 79 (¶ 76); II ER 199–205.  The validity of the Option Agreement has been challenged on multiple grounds in two consolidated suits presently before the California Superior Court for Santa Clara County.  *Stand For San José v. City of San José*, No. 1-11-CV-214196 (Cal. Super. Ct. filed Dec. 2, 2011), No. 1-13-CV-250372 (filed July 30, 2013).  Those challenges are currently scheduled to be adjudicated on August 8, 2014.  MLB's Motion to Take Judicial Notice, Ex. 1 at 1.  To the extent the Option Agreement is actually valid, it is still an option; the Athletics are not obligated to

exercise their option and purchase this property. During this litigation, the

Athletics have extended the option for a third year. III ER 38:15–17. The parcels

purportedly available to the Athletics under the Option Agreement constitute some,

but not nearly all, of the land required to build a ballpark on the proposed site. I

ER 173 n.21; I ER 253.

Pursuant to the Major League Constitution and rules promulgated

thereunder, the Athletics sought permission from MLB to relocate to San José.

MLB worked actively with the Athletics to evaluate new stadium options. *See* II

ER 81 (¶ 83). After thorough consideration, Commissioner Selig, pursuant to the

Major League Rules, formally notified the Athletics' ownership on June 17, 2013

that its relocation proposal was not satisfactory. II ER 6:12–14.

San José[1] commenced this action against Major League Baseball and

Commissioner Selig on June 18, 2013, asserting causes of action under the

Sherman Antitrust Act, California's Cartwright Act, and California's Unfair

Competition Law. *See* II ER 95–103; III ER 56:10–13. San José also brought

state law claims for tortious interference with contract and with prospective

economic advantage. II ER 59.

---

[1] The City of San José is acting as (1) the City itself; (2) the entity responsible for winding up the affairs of the dissolved Redevelopment Agency of the City of San José; and (3) the joint powers authority formed by the city and the former redevelopment agency. Collectively, these are referred to as "San José."

On October 11, 2013, District Court Judge Ronald Whyte dismissed San José's federal and state antitrust claims and its Unfair Competition Law claim. I ER 7.  As to the Sherman Antitrust Act claims, the court followed binding precedent and held that "MLB's alleged interference with the A's relocation is exempt from antitrust regulation."  I ER 23:10–18.  The court dismissed San José's Cartwright Act claim because it was precluded by the Commerce Clause (I ER 27:4–8), and the unfair competition claim because MLB's conduct cannot "violate the 'policy or spirit' of the antitrust laws," as required under California's unfair competition jurisprudence.  I ER 27:18–22; I ER 28:9–10.  The court declined to dismiss San José's tortious interference claims for failure to state a claim, but subsequently dismissed them after declining to retain supplemental jurisdiction.  I ER 7; I ER 5.  Judgment was entered on January 3, 2014.  I ER 3–4.  San José then filed this appeal.

## SUMMARY OF THE ARGUMENT

The United States Supreme Court first declared the business of baseball exempt from antitrust regulation in 1922.  Since then, the Supreme Court has repeatedly enforced the exemption to dismiss a wide variety of claims brought under both federal and state antitrust laws.  Many circuit courts, including this Court, have correctly followed these precedents to exempt the business of baseball from the antitrust laws in case after case.  San José now asserts that all of these decisions are wrong.  San José thus asks this Court both to contravene binding precedent from the Supreme Court, and to ignore well-settled law from across the circuit courts, all of which have held that the business of baseball is exempt from antitrust regulation.

In the 92 years since the Supreme Court first recognized the exemption, the Supreme Court and every circuit court to address it have repeatedly reaffirmed the exemption based on principles of *stare decisis*, baseball's reliance interests, and express deference to Congress. As early as 1957, the Supreme Court recognized solid grounds upon which to preserve the exemption: baseball's "reliance on [the] permanence" of the exemption and Congress' choice not to repeal it, "combined with the flood of litigation that would follow its repudiation" and "the harassment that would ensue."  Therefore, the Supreme Court decided that it would "sustain the unequivocal line of authority reaching over many years."  In the face of this

consistent authority, San José nevertheless asserts that rules central to the business of baseball—those governing the location and relocation of member clubs—violate the Sherman Act.

San José justifies this action based on a misapprehension that the exemption is limited to labor issues regarding the employment of Major League Baseball players. To reach this conclusion, San José asks this Court to reject binding precedent and instead follow a lone Pennsylvania district court decision that has been uniformly rejected by every district court and circuit court to consider it since it was first issued twenty years ago.

San José further argues that even if the exemption were not limited to labor issues, it does not cover MLB's relocation rules. This Court and others, however, have repeatedly recognized that club location and relocation issues are squarely within baseball's antitrust exemption. In 1998, Congress passed the Curt Flood Act, which expressly left the exemption intact for all purposes other than Major League Baseball labor issues. The Curt Flood Act recognized that "franchise expansion, location or relocation" are not subject to antitrust laws. 15 U.S.C. § 26b(b)(3).

San José's Complaint also brought state law claims under the Cartwright Act and Unfair Competition Law based on the same alleged antitrust violations. But San José may not circumvent the federal exemption by creatively asserting the

11

same action under the guise of state law. San José's state law claims are preempted by the Supremacy Clause because of the national antitrust policy embodied in the exemption. And even if professional baseball were not exempt, the Commerce Clause precludes state antitrust regulation of *all* professional sports due to the burden that would be created if national sports leagues were subject to dozens of different state competition laws.

Although baseball's antitrust exemption disposes of this action, San José's claims would falter on independent grounds even if the exemption did not apply. San José lacks antitrust standing to bring its claims. MLB's relocation rules have neither caused nor threatened San José with any cognizable injury, let alone the type of injury the antitrust laws are designed to prevent. Because San José has neither suffered, nor been threatened with, antitrust injury, it does not have standing to pursue these claims under the Clayton Act.

For nearly a century, the Supreme Court has consistently declined invitations to narrow or eliminate the antitrust exemption for the business of baseball. This Court should follow the unequivocal precedent of the Supreme Court, this Court, and every other circuit court to opine on the issue. The Court should affirm the dismissal of San José's claims.

## ARGUMENT

## I.    BASEBALL'S ANTITRUST EXEMPTION BARS SAN JOSÉ'S CLAIMS.

### A.    The Supreme Court has repeatedly held that baseball is exempt from antitrust regulation.

In 1922, the Supreme Court held that the Clayton and Sherman Acts do not apply to the business of baseball. *Federal Baseball Club of Baltimore, Inc. v. Nat'l League of Prof'l Baseball Clubs*, 259 U.S. 200 (1922). Justice Oliver Wendell Holmes, writing for a unanimous court, concluded that baseball was not interstate commerce and therefore was not regulated by the Sherman Act. *Id.* at 208. While the Supreme Court's Commerce Clause doctrine has changed over the last 92 years, the broad scope of the antitrust exemption has not. The Supreme Court has consistently reaffirmed that "the business of baseball" is beyond the scope of antitrust regulation. As the Seventh Circuit correctly noted, "The Supreme Court has held three times that 'the business of baseball' is exempt from the federal antitrust laws." *Charles O. Finley & Co. v. Kuhn*, 569 F.2d 527, 541 (7th Cir. 1978). And each time, it is clear, "the Supreme Court intended to exempt the business of baseball, not any particular facet of that business, from the federal antitrust laws." *Id*.

The current basis for the exemption is equally clear. For the last sixty years, the Supreme Court has reaffirmed baseball's antitrust exemption based on *stare*

13

*decisis*, baseball's reliance interests, and the Court's express deference to Congress on this subject. *See Flood v. Kuhn*, 407 U.S. 258, 285 (1972); *Toolson v. New York Yankees, Inc.*, 346 U.S. 356, 357 (1953); *Radovich v. Nat'l Football League*, 352 U.S. 445, 451–52 (1957); *United States v. Int'l Boxing Club*, 348 U.S. 236, 241–42 (1955); *United States v. Shubert*, 348 U.S. 222, 230 (1955). The Court has observed that "more harm would be done in overruling *Federal Baseball* than in upholding [it]," as "[v]ast efforts had gone into the development and organization of baseball since that decision and enormous capital had been invested in reliance on its permanence." *Radovich*, 352 U.S. at 450. Starting in 1953, the Supreme Court has held consistently that if the exemption were to be altered or curtailed, it is for Congress to do so. *Toolson*, 346 U.S. at 357; *see also Flood*, 407 U.S. at 283, 285; *Radovich*, 352 U.S. at 451; *Int'l Boxing*, 348 U.S. at 244; *Shubert*, 348 U.S. at 229–30. In 1972, the Supreme Court recognized that Congress' deliberate decision not to repeal the exemption amounted to "something other than mere congressional silence and passivity," and instead constituted "positive inaction," reflecting that "Congress had no intention of including the business of baseball within the scope of the federal antitrust laws." *Flood*, 407 U.S. at 283. Then, in 1998, Congress took the affirmative step of enacting the Curt Flood Act, which repealed the exemption only for disputes relating to employment of Major League Baseball players and explicitly affirmed that the exemption covered the rest of the

14

business of baseball, including decisions regarding the location and relocation of

member clubs.  *See* 15 U.S.C. § 26b(b)(3).

**B.    The antitrust exemption broadly applies to the "business of baseball."**

San José argues that baseball's antitrust exemption is limited to a single

aspect of the business of baseball—the employment of professional baseball

players under a restriction commonly called the reserve clause.[2]  In order to make

this argument, San José must ignore authority from the Supreme Court, this Court,

and nearly every other court that has addressed the exemption.  Instead, San José

relies largely on a single, oft-criticized district court decision that, as the District

Court below recognized, "is contrary to the holdings of a vast majority of the

courts that have addressed the issue."  I ER 9:6–7.  This Court should decline San

José's invitation to follow this ill-conceived and unpersuasive opinion.  Under

binding Supreme Court precedents, the business of baseball—including MLB's

relocation rules—is exempt from antitrust regulation.

---

[2] The Supreme Court described the reserve system as follows: "The reserve
system, publicly introduced into baseball contracts in 1887, centers in the
uniformity of player contracts; the confinement of the player to the club that has
him under the contract; the assignability of the player's contract; and the ability of
the club annually to renew the contract unilaterally, subject to a stated salary
minimum."  *Flood*, 407 U.S. at 259 n.1 (internal citation omitted).

**1.    The Supreme Court exempted the "business of baseball," not simply the "reserve clause."**

San José mischaracterizes the Supreme Court's exemption cases, suggesting that those cases involved challenges only to the reserve clause.  This is flatly untrue, as the District Court below correctly recognized.  I ER 15:2–5 & n.10.  The Supreme Court has repeatedly held that the antitrust exemption applies against broader antitrust claims, and it has used the exemption to dismiss such claims.

Even San José concedes, in its otherwise inaccurate description of the opinion, that *Federal Baseball* involved broad allegations of monopolization that extended beyond simple labor issues.  *Federal Baseball*, 259 U.S. at 207; SJ Op. Br. at 22.  The plaintiff in *Federal Baseball* alleged that the American and National Leagues had "conspired to monopolize the base ball business" and had "destroyed the Federal League by buying up some of the constituent clubs and in one way or another inducing all those clubs except the plaintiff to leave their League."  259 U.S. at 207.  The Supreme Court affirmed the dismissal of those claims without distinguishing between labor and non-labor issues, and instead held that the business of baseball is exempt from antitrust laws.  *See also Shubert*, 348 U.S. at 228 ("In *Federal Baseball*, the Court, speaking through Mr. Justice Holmes, was dealing with the business of baseball and nothing else.").

Thirty years later, as the District Court below correctly observed, the plaintiffs in *Toolson* challenged a litany of allegedly anti-competitive

arrangements, including restrictions on: territories for major and minor league clubs, *i.e.*, "circuits"; changes to circuits (which required a vote of the clubs); broadcast and telecast rights by geographic territory; club debt; competition near a club's home city; processes for adding expansion clubs; and club association with other leagues.[3] As it had done before, the Supreme Court upheld the dismissal of the entire complaint—including the non-labor claims—and ruled that the "business of baseball" is not subject to antitrust regulation. *Toolson*, 346 U.S. at 357. Indeed, the holdings in each of the Supreme Court's exemption cases applied the antitrust exemption beyond the reserve clause—to the broader "business of baseball." *See Flood*, 407 U.S. at 285; *Toolson*, 346 U.S. at 357; *see also Radovich*, 352 U.S. at 451 ("[W]e now specifically limit the rule there established [in *Federal Baseball* and *Toolson*] to the facts there involved, *i.e.*, the business of organized professional baseball.").

In 1972, the Court once again considered baseball's antitrust exemption in *Flood v. Kuhn*. San José argues that *Flood*'s holding was "limited to the reserve clause." SJ Op. Br. at 23. This is false. In *Flood*, unlike in *Federal Baseball* or

---

[3] I ER 15:22–27 (District Court Opinion) (citing *Kowalski v. Chandler*, 202 F.2d 413, 414 (6th Cir. 1953); *Toolson v. New York Yankees,* 101 F. Supp. 93, 94 (S.D. Cal. 1951); Petitioner's Opening Brief, *Toolson,* 346 U.S. 356 (No. 18),1953 WL 78316, at *5–9 (Sept. 16, 1953)). *See also* I ER 17 n.12 (District Court Opinion) (noting that the *Federal Baseball* and *Toolson* "opinions are not properly characterized as limited on their facts to the reserve clause").

*Toolson*, the plaintiffs raised claims involving only the reserve system.  Not surprisingly, the Supreme Court thus mentioned the reserve system in certain passages of its opinion.  But the *Flood* Court's holding was ***not*** limited to the reserve clause.  Instead, the Supreme Court decided to preserve the full antitrust exemption based on principles of *stare decisis*, Congress' "positive inaction," and baseball's significant reliance interests.  *Flood*, 407 U.S. at 283–84.  The Supreme Court's reasoning and ruling expressly applied to the "business of baseball."  *Id.* at 285.  In fact, the *Flood* Court adopted—word for word—the *Toolson* holding that the "business of baseball" is not subject to antitrust scrutiny:

> Accordingly, we adhere once again to *Federal Baseball* and *Toolson* and to their application to professional baseball. . . .  We repeat for this case what was said in *Toolson*: "Without re-examination of the underlying issues, the (judgment) below (is) affirmed on the authority of [*Federal Baseball*], so far as that decision determines that Congress had no intention of including the business of baseball within the scope of the federal antitrust laws."

*Id.* at 284–85 (quoting *Toolson*, 346 U.S. at 357).

Based on this unwavering line of Supreme Court authority, the District Court below correctly dismissed San José's attempt to narrow the exemption.  "The [Supreme] Court's ultimate holding that Congressional inaction (at that time for half a century, but for now over 90 years) shows Congress' intent that the judicial exception for 'the business of baseball' remain unchanged. . . .  The Supreme Court is explicit that 'if any change is to be made, it [must] come by

legislative action. . . ."  I ER 22:2–12 (citing and quoting *Flood*, alteration in original).

### 2.    The Ninth Circuit—like many other circuit courts—holds that the antitrust exemption applies broadly to the "business of baseball."

San José insists that the Supreme Court has exempted ***only*** labor issues.  In response to this argument below, the District Court recognized that San José's "position . . . is contrary to the holdings of a vast majority of the courts that have addressed the issue.  All federal circuit courts that have considered the issue (the Eleventh, Seventh, Ninth and Second Circuits) have ***not*** limited the antitrust exemption to the reserve clause, but have adopted the view that the exemption broadly covers the 'business of baseball.'"  I ER 9:6–10 (emphasis in original).

The Ninth Circuit has recognized the broad scope of the exemption on more than one occasion.  For example, when MLB created a new team in Seattle, it was sued for antitrust violations.  The Ninth Circuit thought that the application of the exemption was so clear that it dismissed the antitrust claims in a single sentence.[4]

*Portland Baseball Club, Inc. v. Kuhn*, 491 F.2d 1101 (9th Cir. 1974) (per curiam),

---

[4] San José misrepresents that the Ninth Circuit "has previously found that the 'exemption'" was of a more limited scope, citing *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291 (9th Cir. 1982).  SJ Op. Br. at 24.  This is entirely inaccurate.  In *Twin City*, an MLB club raised antitrust claims against a concessionaire (not the other way around).  *Twin City*, 676 F.2d at 1296.  No party raised the issue of the exemption and therefore this Court did not address the exemption in its opinion.  *Id.* at 1291.  For this reason, the District Court held that "*Twin City* does not provide support for the City's position."  I ER 19:5–7.

*affirming* 368 F. Supp. 1004 (D. Or. 1971). Fourteen years earlier, in a case brought by the same plaintiff—a minor league club—the Ninth Circuit also dismissed antitrust claims based on binding Supreme Court precedent. *Portland Baseball Club, Inc. v. Baltimore Baseball Club, Inc.*, 282 F.2d 680, 680 (9th Cir. 1960) (citing *Toolson* and *Radovich*). The Ninth Circuit correctly noted that the Supreme Court has held "that if professional baseball is to be brought within the pale of federal antitrust laws, the Congress must do it." *Id.*

Every other circuit court to address the scope of the exemption has likewise held that it applies beyond the reserve clause to cover the business of baseball. For example, in 1978, Charlie Finley—then-owner of the Athletics—challenged the Commissioner's ruling that Finley could not make certain deals to sell player contracts to other clubs, and the Seventh Circuit considered whether the antitrust exemption applied. *Finley*, 569 F.2d at 530–31. The Seventh Circuit recognized that "[d]espite the two references in the *Flood* case to the reserve system, it appears clear . . . that the Supreme Court intended to exempt the business of baseball, not any particular facet of that business, from the federal antitrust laws." *Id.* at 541.

Similarly, the Eleventh Circuit has held that a minor league "franchise location system"—including territorial restrictions on clubs—is exempt from antitrust regulation. *Prof'l Baseball Sch. & Clubs, Inc. v. Kuhn*, 693 F.2d 1085, 1085–86 (11th Cir. 1982) (citing *Flood*, *Toolson*, and *Federal Baseball*). In

20

another decision, the Eleventh Circuit observed that the argument San José advances here "has scant support in the case law; the vast majority of lower courts have held that the exemption created by the U.S. Supreme Court extends more broadly to the 'business of baseball.'" *Major League Baseball v. Crist*, 331 F.3d 1177, 1181 n.10 (11th Cir. 2003). The Eleventh Circuit then applauded the lower court opinion for having "forcefully destroyed the notion that the antitrust exemption should be narrowly cabined to the reserve system." *Id.* (citing *Major League Baseball v. Butterworth*, 181 F. Supp. 2d 1316, 1322–32 (N.D. Fla. 2001)). And other circuit courts have also applied the exemption to bar antitrust claims that were either broader than, or had nothing to do with, the reserve clause.[5]

In short, San José wants this Court to repudiate binding Ninth Circuit law and to ignore the persuasive analysis offered by every other circuit court to consider this question.

### 3. San José asks this Court to reject binding Supreme Court precedent and Ninth Circuit law and to instead follow a widely criticized district court opinion.

Turning a blind eye to these precedents, San José urges this Court to follow a lone district court opinion, in another circuit, from twenty years ago. SJ Op. Br.

---

[5] *Salerno v. Am. League of Prof'l Baseball Clubs*, 429 F.2d 1003, 1005 (2d Cir. 1970) (exempting employment claims brought by MLB umpires because "professional baseball is not subject to the antitrust laws"); *cf. Triple-A Baseball Club Assocs. v. Ne. Baseball, Inc.*, 832 F.2d 214, 216 n.1 (1st Cir. 1987) (noting that "professional baseball has had a long-standing exemption from the antitrust laws" that applies to the expansion of clubs into new territories).

at 20 (citing *Piazza v. Major League Baseball*, 831 F. Supp. 420, 438 (E.D. Pa. 1993)).[6] San José's only argument for such an extreme departure from well-settled law is its erroneous assertion that *Piazza* reflects the "most recent district court analysis of the 'exemption.'" SJ Op. Br. at 20. In reality, multiple district courts—including the Northern District of California here—have considered *Piazza*'s reasoning. All have rejected it.[7]

In its opinion, the *Piazza* court recognized the undeniable: the scope of the exemption was set out in *Federal Baseball*, *Toolson*, and *Radovich* as "extending to the 'business of organized professional baseball.'"[8] *Piazza*, 831 F. Supp. at

---

[6] Only the Florida **state** judiciary has found *Piazza* persuasive. *See, e.g., Butterworth v. Nat'l League of Prof'l Baseball Clubs*, 644 So. 2d 1021, 1023–25 (Fla. 1994); *Morsani v. Major League Baseball*, 663 So. 2d 653, 657 (Fla. Ct. App. 1995). Even the Florida Supreme Court recognized that "the *Piazza* court is the only federal court to have interpreted baseball's antitrust exemption so narrowly" and that "[t]here is no question that *Piazza* is against the great weight of federal cases regarding the scope of the exemption." *Butterworth*, 644 So. 2d at 1024–25.

[7] *See, e.g.*, *Major League Baseball v. Butterworth*, 181 F. Supp. 2d 1316, 1324 n.4 (N.D. Fla. 2001), *aff'd, Crist*, 331 F.3d 1177 (2003); *McCoy v. Major League Baseball*, 911 F. Supp. 454, 457 (W.D. Wash. 1995); *New Orleans Pelicans Baseball, Inc. v. Nat'l Ass'n of Prof'l Baseball Leagues, Inc.*, No. 93-253, 1994 WL 631144, at *9 (E.D. La. Mar. 1, 1994); *Morsani v. Major League Baseball*, 79 F. Supp. 2d 1331, 1335 n.12 (M.D. Fla. 1999). And, as noted above, circuit courts, both before and after *Piazza*, have correctly rejected the same argument because it ignores the Supreme Court's consistent holding that the "business of baseball" is exempt from antitrust scrutiny. *See Finley*, 569 F.2d at 541; *Crist*, 331 F.3d at 1181.

[8] San José's argument that *Radovich* and *Shubert* somehow support its position that the exemption is limited to the reserve clause is thus undermined even by *Piazza*. SJ Op. Br. at 24 n.2

435–36.  Based on these cases, the *Piazza* court conceded that prior to 1972, "Baseball's expansive view may have been correct."  *Id* at 435.  The *Piazza* court, however, erroneously concluded that once the Court in *Flood* acknowledged that professional baseball was interstate commerce, this "stripped from *Federal Baseball* and *Toolson* any precedential value those cases may have had beyond the particular facts there involved, *i.e.*, the reserve clause."  *Id.* at 436.  The District Court below dismissed this argument easily—"the reserve clause is never referenced in [*Federal Baseball, Toolson*, and *Flood*] as part of the Court's holdings"—but a more detailed analysis leads to the same result.  I ER 21:27–22:2.

The *Piazza* court misunderstood both the facts of those cases and their holdings.  *First*, the court misread *Federal Baseball* and *Toolson* as involving challenges only to baseball's reserve system.  *Piazza*, 831 F. Supp. at 438.  As explained above, however, both *Federal Baseball* and *Toolson* involved challenges to other aspects of the business of baseball including, in *Toolson*, a challenge to MLB's internal rules governing the location and relocation of Major League clubs.  *See* above at I.B.1.

*Second*, the *Piazza* court erroneously believed that the Supreme Court's decision in *Flood* implicitly made prior precedent irrelevant by acknowledging the interstate nature of professional baseball.[9]  *Piazza*, 831 F. Supp. at 438.  But, as

_____

[9] The *Piazza* court provided no justification for deviating so completely from

described above, almost 20 years earlier—in *Toolson*—the Supreme Court had already departed from the distinction between interstate and intrastate commerce and instead rested the antitrust exemption on *stare decisis*, baseball's reliance interests, and deference to Congress. *Toolson*, 346 U.S. at 357. The Supreme Court's opinion in *Flood* reaffirmed ***these*** bases for the exemption, while observing that—by 1972—professional baseball was undoubtedly engaged in interstate commerce. *Flood*, 407 U.S. at 282, 283–85. In other words, the exemption has not rested on the distinction between interstate and intrastate commerce since at least 1953. The exemption rests, instead, on *stare decisis*, baseball's reliance interests, and deference to Congress' choice to leave the exemption in place.

 *Third*, the notion that *Flood* narrowed the scope of the baseball exemption cannot be reconciled with both *Flood*'s stated purpose—maintaining the status quo of the exemption—and its verbatim use of *Toolson*'s holding. *Flood*, 407 U.S. at 285. In fact, the *Flood* opinion repeatedly explains that the Court was determined to make its holding consistent with the Court's prior decision in *Toolson*. *Id*. at 284–85.

---

traditional principles of *stare decisis*. To the contrary, the court openly acknowledged that its logic was inconsistent with "the American system of precedent" and maintained that it was predicated upon the English system of precedent. *Piazza*, 831 F. Supp. at 437–38.

24

Accordingly, this Court should reject *Piazza*'s improper deviation from binding Supreme Court precedent.

## C. MLB's relocation rules are squarely within the antitrust exemption and factual discovery is unnecessary.

San José argues that even if the baseball antitrust exemption is not limited to the reserve clause, it nonetheless fails to cover MLB's relocation rules. But every court to consider this question has held that relocation rules—and broader questions of league structure—are exempt from antitrust regulation.

### 1. MLB's relocation rules, like other core issues of league structure, are exempt from antitrust regulation.

Multiple courts, including this one, have recognized that MLB's rules regarding league structure, operating territories, and team relocation are at the core of the business of baseball and thus are covered by the antitrust exemption. As one district court put it: "The defendants are in the business of baseball. Their business is a legally sanctioned monopoly. One of the central features of that monopoly is the power to decide who can play where." *New Orleans Pelicans*, 1994 WL 631144, at *9.

Two years after the Supreme Court reaffirmed baseball's broad exemption in *Flood*, the Ninth Circuit held that the relocation of an MLB club into formerly minor league territory did not violate the antitrust laws. *Portland Baseball Club, Inc. v. Kuhn*, 491 F.2d at 1102–03. Citing *Flood*, this Court affirmed the district

ZZZ

court's dismissal of the antitrust claims in one sentence: "Finally, the plaintiff's claim for relief under the antitrust laws was properly dismissed." *Id.* at 1103.

The Eleventh Circuit similarly held that a minor league "franchise location system" is exempt from antitrust scrutiny because it is "an integral part of the business of baseball." *Prof'l Baseball Sch. & Clubs, Inc. v. Kuhn*, 693 F.2d 1085, 1086 (11th Cir. 1982); *see also Crist*, 331 F.3d at 1183 (explaining that issues "central to baseball's league structure"—like league contraction—are exempt from antitrust regulation). The Wisconsin Supreme Court held that "decisions made with respect to location or transfer of a franchise" are completely exempt from scrutiny under federal and state antitrust laws. *Wisconsin v. Milwaukee Braves, Inc.*, 144 N.W.2d 1, 15 (Wis. 1966). And the Minnesota Supreme Court decided that "relocation of a baseball franchise" was "an integral part of the business of professional baseball" and thus held that relocation "falls within the exemption." *Minn. Twins P'ship v. State ex rel. Hatch*, 592 N.W.2d 847, 856 (Minn. 1999).

San José nevertheless suggests that relocation issues are not within the scope of the exemption based on a misinterpretation of *Henderson Broadcasting Corp. v. Houston Sports Association*, 541 F. Supp. 263, 268–69 (S.D. Tex. 1982), and *Postema v. National League of Professional Baseball Clubs*, 799 F. Supp. 1475 (S.D.N.Y. 1992). Directly contrary to San José's assertion, *Henderson* and *Postema* both recognize that issues of league structure ***are*** within the scope of the

exemption.[10]  *Henderson*, 541 F. Supp. at 269–70; *Postema*, 799 F. Supp. at 1488–89.  As the District Court below correctly observed, even under "the more narrow tests from *Henderson* and *Postema*," MLB's "alleged interference with a baseball club's relocation efforts presents an issue of league structure that is 'integral' to the business of baseball, and thus falls squarely within the exemption."[11]  I ER 23:11–16 (citing *Prof'l Baseball Sch. & Clubs*, 693 F.2d at 1086).

### 2.    San José never asked for discovery below, and the scope of the exemption was properly decided without a developed record.

San José attempts to manufacture an issue not raised in the district court below by claiming that a factual record is needed to assess whether MLB's relocation rules are "unique characteristics and needs" of baseball.  SJ Op. Br. at 23, 26, 30, 33–35.  San José *never* asked the District Court to withhold dismissal until after discovery had been held, and therefore San José has *waived* this issue.  *Zixiang Li v. Kerry*, 710 F.3d 995, 1000 n.4 (9th Cir. 2013) ("[A] party waives an

---

[10] San José ignores cases such as *Hale v. Brooklyn Baseball Club*, which—like *Toolson*—recognized that MLB's broadcasting rules are within the scope of the exemption.  Tr. of Mtn. to Dismiss Hr'g at 2–3 (N.D. Tex. Sept. 19, 1958) (MLB's Motion to Take Judicial Notice, Ex. 3 at 2–4).

[11] Indeed, San José concedes that club location issues meet the improperly strict *Postema* standard by citing to club location cases in San José's list of cases that "concerned characteristics and needs of baseball that were unique to baseball."  SJ Op. Br. at 26–27 (citing *Prof'l Baseball Sch. & Clubs*, 693 F.2d 1085; *New Orleans Pelicans*, 1994 WL 631144).

argument by failing to make it before the district court.... (quoting *G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012)).

In any event, the Court does not need discovery to determine that MLB's relocation rules are covered by the exemption. Whether the antitrust exemption applies is "a purely legal question." *McCoy v. Major League Baseball*, 911 F. Supp. 454, 456 (W.D. Wash. 1995); *Frontier Enters. v. Amador Stage Lines*, 624 F. Supp. 137, 142 (E.D. Cal. 1985) ("Whether defendants' conduct is exempt from application of the antitrust laws . . . is a question of law.")

San José bases its argument on a mischaracterization of the Supreme Court's decision in *Flood*, which at one point explains that the exemption "rests on a recognition and an acceptance of baseball's unique characteristics and needs." *See Flood*, 407 U.S. at 282. Baseball's "unique characteristics and needs" were never intended to be a distinct legal standard nor were they part of the Court's holding. *Id*. The Court's holding—that the "business of baseball" is exempt from the antitrust laws—depended on *stare decisis*, baseball's reliance interests, and deference to Congress. *Id.* at 285. Indeed, the Ninth Circuit has applied the exemption to MLB's relocation rules, and it did so on a motion to dismiss. *Portland Baseball Club*, 491 F.2d at 1103. Other courts have consistently found it appropriate to apply the antitrust exemption and dispose of cases at the motion to dismiss stage. *See, e.g.*, *Toolson*, 346 U.S. at 356; *Prof'l Baseball Sch. & Clubs*,

28

693 F.2d at 1085–86; *see also McCoy*, 911 F. Supp. at 458; *Salerno v. Am. League of Prof'l Baseball Clubs*, 310 F. Supp. 729, 730–31 (S.D.N.Y. 1969), *aff'd*, 429 F.2d 1003, 1005 (2d Cir. 1970).

MLB's relocation rules are a central aspect of the business of baseball and thus are exempt from antitrust regulation. The District Court's order should be affirmed.

**D.    Congress has recognized the exemption's broad scope.**

Congress has not ignored the Supreme Court's consistent holding that any alteration of the existence or scope of the exemption must be made by Congress, not the Court. *Flood*, 407 U.S. at 284. In fact, Congress has regularly considered legislation addressing the existence and scope of professional baseball's antitrust exemption.[12] And Congress has repeatedly refused to subject all but one aspect of the business of baseball—including club relocation—to antitrust regulation.

In 1998, Congress enacted the Curt Flood Act, 15 U.S.C. § 26b, again reinforcing that the bulk of the business of baseball is exempt from antitrust laws. The Curt Flood Act provided Major League Baseball players, for the first time, with certain antitrust recourse for injuries arising out of their employment. 15

---

[12] The Supreme Court in *Flood* found it particularly relevant that, in the 19 years between its decisions in *Toolson* and *Flood*, "more than 50 bills [were] introduced in Congress relative to the applicability or nonapplicability of the antitrust laws to baseball." *Flood*, 407 U.S. at 281. Similarly, in the 42 years since *Flood*, Congress has held ***45 hearings*** on baseball's antitrust exemption. *See* Statutory and Legislative Addendum at page 66.

U.S.C. § 26b(a).  But Congress explicitly declined to repeal the exemption as it applies to any other aspect of the business of baseball—including franchise relocation.  Instead, the Curt Flood Act specifically states that it "does ***not*** create, permit or imply a cause of action . . . under the antitrust laws, or otherwise apply the antitrust laws to" anything other than issues relating to the employment of Major League players.  15 U.S.C. § 26b(b) (emphasis added); *see also id.* (mandating that "[n]o court shall rely on the enactment of this section as a basis for changing the application of the antitrust laws to any conduct, acts, practices, or agreements other than those set forth in subsection (a).").

The Curt Flood Act left the antitrust exemption intact with respect to the rest of the business of baseball, including "***franchise expansion, location or relocation***."  15 U.S.C. § 26b(b)(3) (emphasis added).  By explicitly choosing which aspects of the business of baseball would be subject to antitrust laws, Congress confirmed what the Supreme Court had long recognized—that Congress does not intend for the antitrust laws to apply to the business of baseball except for Major League player employment issues.  *See* I ER 23:2–4; *Morsani v. Major League Baseball*, 79 F. Supp. 2d 1331, 1335 n.12 (M.D. Fla. 1999).  The Supreme Court has held that when "legislative history reveals clear congressional awareness" of a judicially-created antitrust exemption, and then "Congress specifically addresses this area"—while leaving the exemption "undisturbed"—this

"lends powerful support to [the] continued viability" of the exemption. *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 419 (1986).

San José falsely states that there "is no evidence of congressional support for immunizing franchise relocation decisions from antitrust scrutiny." SJ Op. Br. at 31–32. To the contrary, the congressional record reflects that Congress—including key members of Congress—intended to preserve the scope of the exemption so that it covered franchise relocation. For example:

- Statement of Sen. Moynihan (co-sponsor): "This bill is designed to be a partial repeal of major league baseball's antitrust exemption. It would leave the exemption in place as it pertains to . . . the ability of major league baseball to control the relocation of franchises." 143 Cong. Rec. S379-01 (1997), *available at* 1997 WL 22690.
- Statement of Sen. Thurmond (co-sponsor): "The legislation maintains the status quo for franchise location. . . ." *Id.*

Although this Court need not look to the legislative history—because the text of the statute is clear on its face—San José is emphatically wrong when it claims that there is "no evidence of congressional support" for keeping relocation issues exempt.

In fact, the careful drafting of the Curt Flood Act directly contradicts San José's arguments on the scope of the exemption. According to San José, only the reserve clause remained exempt after the Supreme Court's decision in *Flood*. SJ Op. Br. at 20–21. If that were correct, then a statute giving antitrust recourse to Major League players for employment issues would have eliminated the exemption

in its entirety, and would have been easy to accomplish.  If Congress intended to

"overturn[] the *Federal Baseball* line of cases" as San José asserts, it could have

abolished the exemption in a single sentence, rather than explicitly preserve the

rest of it, including "franchise expansion, location or relocation."  SJ Op. Br. at 31;

15 U.S.C. § 26b(b)(3).[13]  Consistent with this clear reading, no court has concluded

that the Curt Flood Act eliminated the antitrust exemption.

San José concedes that professional baseball has developed, in the 92 years

since *Federal Baseball*, on the understanding that it was not subject to existing

antitrust legislation.  SJ Op. Br. at 4.  Baseball has done so not only in reliance

upon Supreme Court jurisprudence but also upon the Supreme Court's express

instruction that only Congress may repeal the exemption.  It would be inequitable

for a court to reverse direction now, especially after Congress took action and left

the exemption largely intact.

## II.    THE STATE LAW ANTITRUST AND UNFAIR COMPETITION CLAIMS WERE PROPERLY DISMISSED.

The District Court correctly rejected San José's attempt to circumvent the

antitrust exemption via state law claims under California's Cartwright Act and

Unfair Competition Law ("UCL").  I ER 27:4–6, I ER 28:13.  The U.S.

---

[13] If Congress merely wanted to reverse the *Federal Baseball* line, it knew how to do so explicitly. *See, e.g.*, S. 500, 103d Cong. (1993) (proposed bill amending the Clayton Act to add, "the antitrust laws shall apply to the business of organized professional baseball"); H.R. 386, 104th Cong. (1995) (same).

Constitution—under both the Supremacy Clause and the Commerce Clause—precludes such claims.  Further, San José's unfair competition claim fails because San José has not alleged any "unfair" conduct and because San José lacks standing.  The District Court's dismissal of those claims should be affirmed.

**A.    San José's state law antitrust and unfair competition claims are preempted by the Supremacy Clause.**

The Supreme Court held in *Flood* that the federal policy embodied in the antitrust exemption preempts state antitrust regulation of baseball.  *Flood*, 407 U.S. at 284.  The Court also held that state antitrust regulation of baseball would conflict with the need for consistent, national regulation of baseball.  *Id.*  The Supremacy Clause flatly prohibits this type of inconsistent regulation (U.S. Const. Art. VI, cl. 2), and on that basis, the *Flood* Court upheld the dismissal of state law claims.[14]  *Flood*, 407 U.S.

San José erroneously argues that MLB "failed to meet its burden" because it "failed to identify which form of preemption it asserted."  SJ Op. Br. at 36.  The form of preemption asserted is irrelevant.  Because the Supreme Court has already

---

[14] Regulation of professional baseball is therefore an exception to the general rule that federal antitrust law does not preempt state antitrust law.  *See In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 611 (7th Cir. 1997) (Posner, J.) (observing that federal antitrust law uniquely preempts state antitrust law for baseball).  Baseball is not an area where "Congress has refrained from federal antitrust regulation," thereby leaving the states "free reign to apply their antitrust laws."  *Crist*, 331 F.3d at 1184.  Instead, "federal law establishes a universal"—meaning national—"exemption in the name of uniformity."  *Id.* at 1186.

33

held that state antitrust regulation of baseball is preempted (*Flood*, 407 U.S. at 284), this Court need not engage in any original analysis of preemption law.  The Court should reject San José's invitation to reject binding Supreme Court precedent.  *See Ferguson v. Corinthian Colls., Inc.*, 733 F.3d 928, 934, 937 (9th Cir. 2013) (holding that California's *Broughton-Cruz* rule was preempted by the Federal Arbitration Act based on the Supreme Court's statement that "'[w]hen state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA.'") (quoting *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1747 (2011)); *see also Mortensen v. Bresnan Commc'ns., LLC*, 722 F.3d 1151, 1160 (9th Cir. 2013) (holding that Montana law was preempted by the FAA because the court was "bound by [its] duty to apply" Supreme Court precedent); *Forrester v. Am. Dieselectric, Inc.*, 255 F.3d 1205, 1209–10 (9th Cir. 2001) (concluding that the Supreme Court's holding controlled and that the plaintiff's claim was thus preempted by the Locomotive Inspection Act).  Both claims, therefore, were properly dismissed.

**B.**   **San José's state law claims are precluded by the Commerce Clause.**

San José's Opening Brief ignores the fact that the state claims are also barred by the Commerce Clause, which precludes plaintiffs from using state laws to unduly burden interstate commerce.  *Flood*, 407 U.S. at 284–85.  As the District Court correctly explained, "[a]llowing the state claims to proceed would 'prevent

needed national uniformity in the regulation of baseball.'"  I ER 27:6–8 (quoting

*Butterworth*, 181 F. Supp. 2d at 1333).[15]  The Commerce Clause prohibits the

application of state antitrust laws not only in baseball, which has a unique antitrust

exemption, but also in other professional sports.  *See, e.g.*, *Robertson v. Nat'l*

*Basketball Ass'n*, 389 F. Supp. 867, 880–81 (S.D.N.Y. 1975) (barring application

of state antitrust laws to the NBA as an impermissible burden on interstate

commerce).  In fact, the California Supreme Court has found that professional

sports leagues like "baseball" need a "nationally uniform set of rules governing the

league structure," to avoid "[f]ragmentation" and "differing state antitrust

decisions."  *Partee v. San Diego Chargers Football Co.*, 34 Cal. 3d 378, 385

(1983) (holding that the Cartwright Act "would be in conflict with the commerce

clause" if it were applied to regulate professional football); *see also Wisconsin v.*

*Milwaukee Braves, Inc.*, 144 N.W.2d 1, 18 (Wis. 1966).  San José's state law

claims necessarily create an unconstitutional burden on interstate commerce by

threatening inconsistent state-by-state regulation of a national sport.

---

[15] San José's failure to present any argument for reversing the District Court's
dismissal of its Cartwright Act claim is a waiver.  I ER 27:4–8; *Christian Legal
Soc'y Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 485 (9th Cir. 2010) ("We
review only issues [that] are argued specifically and distinctly in a party's opening
brief." (alteration in original)).

### C.     San José's unfair competition claim fails to state a claim.

San José's UCL claim fails for two additional reasons.  *First*, San José did not allege an "unlawful, unfair, or fraudulent business act or practice" sufficient to establish a claim under California law.  *Second*, San José lacks standing to assert its claim.

### 1.     San José fails to allege an "unlawful, unfair, or fraudulent business act or practice."

To assert a viable UCL claim, a plaintiff must allege an "unlawful, unfair, or fraudulent business act or practice."  *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (quoting Cal. Bus. & Prof. Code § 17200).  San Jose asserts a claim under the "unlawful" prong based on an alleged Cartwright Act violation.  II ER 98:3–8; *see also* SJ Op. Br. at 54.  But the District Court correctly held that since San Jose's allegations were insufficient to state a claim under the antitrust laws—in light of baseball's antitrust exemption—then "the unlawful competition claims necessarily fail."  I ER 27:10–17.

San José also alleges that MLB's conduct falls under the "unfair" prong of the UCL.  SJ Op. Br. at 54.  But where "the same conduct is alleged to support both a plaintiff's federal antitrust claims and state law unfair competition claim, a finding that the conduct is not an antitrust violation precludes a finding of unfair competition."  *LiveUniverse, Inc. v. MySpace, Inc.*, 304 Fed. App'x 554, 557–58 (9th Cir. 2008); *Chavez v. Whirlpool Corp.*, 93 Cal. App. 4th 363, 375 (2001); *see*

*also DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119, 1146–47 (N.D. Cal. 2010).

Further, San José has not alleged any independently "unfair" conduct under any interpretation of *Cel-Tech* and its progeny.[16] *See Cel-Tech*, 20 Cal. 4th at 187 ("the word 'unfair' . . . means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition"). San José argues that MLB's supposed "delay tactics" constitute "unfair" conduct under the UCL. SJ Op. Br. at 53, 55–56. But as the District Court correctly found, any purported "delay" in making a decision violates no public policy or legal duty owed to San José, much less the letter or spirit of the antitrust laws.[17] *See* ER I 28:8–10; *Burton v. Nationstar Mortg., LLC*,

---

[16] San José again misconstrues MLB's citation below to *National Credit Reporting Association v. Experian Information Solutions, Inc.*, No. C04–01661 WHA, 2004 WL 1888769, at *3 (N.D. Cal. July 21, 2004). MLB cited that case only to illustrate that the District Court had "arising under" jurisdiction over the state claims because those claims depend on a significant question of federal law. San José agrees with MLB on this point. As it stated, "[t]his appeal relates to a *purely federal question* of significant importance regarding the validity and appropriate scope of the so-called 'baseball exemption' to the American antitrust laws." SJ Op. Br. at 11 (emphasis in original).

[17] San José is thus mistaken when it states that the District Court dismissed its "claim for unfair competition on the theory that the claim relies solely on alleged antitrust violations," and that the Court ignored its "unfairness" claim based on MLB's "intentional delay tactics." *Compare* SJ Op. Br. at 53 *with* I ER 28:8–13 (rejecting San José's "intentional delay" theory as a matter of state law).

812213

No. CV F 13-0307 LJO GSA, 2013 WL 2355524, at *18 (E.D. Cal. May 29, 2013) (dismissing the plaintiff's UCL claim where "generalities of [the defendant's] delay" failed to state a claim for "unfair" conduct).

San José's "delay" theory has no legal significance separate from MLB's relocation rules, which rise or fall under the antitrust laws. San José's unfair competition claim is derivative of its legally deficient antitrust claims and, therefore, was properly dismissed. *Parrish v. NFL Players Ass'n*, 534 F. Supp. 2d 1081, 1092–94 (N.D. Cal. 2007). And, despite San José's assertion to the contrary, the District Court properly determined on a motion to dismiss that MLB's conduct was not "unfair." *See Burton*, 2013 WL 2355524, at *1, *18, *20; *DocMagic, Inc.*, 745 F. Supp. 2d at 1146–47; *see also Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 252 (2010).

### 2.    San José lacks standing to assert an Unfair Competition Law claim.

As a city, San José is not a "person" under the UCL. *See* Cal. Bus. & Prof. Code §§ 17201 & 17204; *In re Cell Tower Litig.*, 807 F. Supp. 2d 928, 945–46 (S.D. Cal. 2011); *Cmty. Mem'l Hosp. v. Cnty. of Ventura*, 50 Cal. App. 4th 199, 209–11 (1996). This case also is not a properly authorized public prosecutor case brought on behalf of the People of California. *See, e.g.*, *Cnty. of Santa Clara v. Astra U.S., Inc.*, 428 F. Supp. 2d 1029, 1032–36 (N.D. Cal. 2006). A city attorney is authorized by statute to bring public prosecutor actions on behalf of only "the

people of the State of California," *not* the people of a single city, such as San José. Cal. Bus. & Prof. Code § 17204; *see also California v. Steelcase, Inc.*, 792 F. Supp. 84, 85–86 (C.D. Cal. 1992) (concluding that the UCL "expressly authorizes this action to be prosecuted in the name of the People," and "[t]he People are the same party as the State of California"), *overruled on other grounds by California v. Dynergy, Inc.*, 375 F.3d 831, 849 (9th Cir. 2004). San José admits that the interests of its citizens in this case actually may *compete* with those of other Californian citizens, such as the people of Oakland. II ER 63:5–11.

San José likewise does not have standing to seek restitution under the UCL because the damages it seeks are not funds MLB obtained from San José or the citizens of San José. *Bradstreet v. Wong*, 161 Cal. App. 4th 1440, 1461 (2008) (a plaintiff must have suffered a loss of money or property and the defendant must have "acquired or directly and personally benefited from" the property that the plaintiff lost). Therefore, San José's UCL claim was properly dismissed.

## III.     SAN JOSÉ DOES NOT HAVE ANTITRUST STANDING.

Even if San José had pleaded a cognizable antitrust claim—which it cannot do in the face of the antitrust exemption—its Complaint would still fail for the additional reason that San José lacks antitrust standing. Antitrust standing is a question of law that can be properly decided on a motion to dismiss. *See, e.g.*, *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459

U.S. 519, 524, 545 (1983) (affirming dismissal on the pleadings).  The District Court below held that San José "lacks standing to assert an antitrust claim for treble damages under section 4 of the Clayton Act."  I ER 24:15–16.  In addition, the District Court raised grave doubts about San José's standing to seek injunctive relief under § 16 of the Clayton Act (I ER 25:20–26:6), although it ultimately concluded that it "need not decide [the § 16 ] issue" because it dismissed the "antitrust claims on the basis of the federal antitrust exemption for the business of baseball."  I ER 25:20–26:6.  As the record demonstrates, San José lacks antitrust standing for both damages and injunctive relief.

## A.     San José lacks standing to seek damages under § 4 of the Clayton Act.

In the Ninth Circuit, courts determine antitrust standing based upon consideration of five factors: "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages."  *Am. Ad Mgmt., Inc. v.  Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1054 (9th Cir. 1999) (citing, among others, *Associated Gen. Contractors*, 459 U.S. at 535).  The first factor—antitrust injury—is a "necessary" condition of antitrust standing.[18]  *See Cargill Inc.*

---

[18] San José cites selectively from *American Ad Management* in its opening brief and suggests that no single factor is decisive.  *See* SJ Op. Br. at 42.  San José is wrong.  The Supreme Court has squarely held that antitrust injury is a "necessary"

*v. Monfort of Colo., Inc.*, 479 U.S. 104, 110 (1986). San José fails to allege this "necessary" antitrust injury and similarly fails to satisfy the other four factors. Thus, as the District Court held, the Complaint must be dismissed.

### 1.    The Complaint fails to allege antitrust injury, which is an essential component of any claim under the Clayton Act.

The Ninth Circuit's first and most important factor for assessing antitrust standing focuses on whether the plaintiff can show "'antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Am. Ad Mgmt.*, 190 F.3d at 1055 (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)). The federal courts consider various factors in determining whether a plaintiff has suffered antitrust injury; San José satisfies none of them and thus fails to establish its standing under § 4.

### a.    San José does not allege damage to "business or property" as required by the Clayton Act.

Under the Clayton Act, a plaintiff must allege an injury to its "business or property," which the Supreme Court has defined as "commercial interests or enterprises." *Hawaii v. Standard Oil, Co.*, 405 U.S. 251, 264 (1972). On appeal,

---

condition of antitrust standing, which is why MLB's briefing in the District Court focused on that factor. *See Cargill*, 479 U.S. at 110. Still, San José criticizes MLB for not addressing ***all*** of the *Associated General Contractors* factors. SJ Op. Br. at 43. Ironically, San José itself does ***not*** address most of the factors. This Answering Brief does.

as it did below, San José ignores the bulk of the injuries alleged in the Complaint and instead focuses solely on alleged damages related to the sale of the Diridon land. SJ Op. Br. at 47. It does so because the injuries actually alleged in the Complaint, including "loss of tax revenue, property values and jobs," are not injuries to San José's "commercial interests or enterprises" and thus are not antitrust injury. II ER 91:16–18; *see also* II ER 92:22–95:11. On the contrary, these alleged "damages" are precisely the sort of generalized economic harms that the Supreme Court has held do ***not*** constitute injury to business or property. *Hawaii* squarely held that a government can recover only for "those injuries suffered in its capacity as a consumer of goods and services," and not for "injury to its general economy." *Hawaii*, 405 U.S. at 263–65.

San José as much as admits its failure to plead antitrust injury in its Opening Brief, which focuses exclusively on alleged damages related to the desired sale of the Diridon property. But the Complaint lacks any basis on which to contend that the Athletics' failure to exercise the Option Agreement would, in fact, harm San José's "business or property." San José has never alleged that it will not be able to sell the Diridon property to other buyers after expiration of the Option Agreement. Instead, it insists that it would ***prefer*** to sell the land to the Oakland Athletics. But a municipal preference is not an injury to "business or property" suffered "in its capacity as a consumer of goods and services." *Hawaii*, 405 U.S. at 265. And

42

there is no reason to conclude that other potential buyers would pay less than the Athletics for this land.  To the contrary, the District Court took judicial notice of official San José and California documents reflecting that the value of the Diridon property on the open market amounts to $26.1 million, while the Option Agreement permits the Athletics to purchase it for ***only $6.975 million***.[19]  Thus, San José stands to receive a direct economic ***benefit***—to the tune of nearly $20 million—if the land is sold instead at fair market value.

### b.    San José is not a participant in any cognizable market.

The second reason that San José has no antitrust injury is that it does not participate in the relevant market alleged in the Complaint and San José's suggested alternative market is not cognizable under antitrust law.  In order for a plaintiff to establish antitrust injury, it must "be a participant in the same market as the alleged malefactors."  *Am. Ad Mgmt.*, 190 F.3d at 1057.  The Complaint alleges that the "relevant product market is the provision of major league men's professional baseball contests."  II ER 69:13–14.  But San José is not a Major League club, a potential purchaser of a Major League club, or the owner of a stadium that is available for lease to a Major League club.  Simply put, San José does not participate in the market of providing Major League Baseball contests simply because it wants a Major League club to relocate within its borders.  *Cf. Los*

---

[19] *Compare* II ER 79 (¶ 76) *and* II ER 199–200, *with* I ER 233 (California State Controller's Asset Transfer Review, Sch. 2).

*Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381, 1394 (9th Cir. 1984) ("A stadium is a distinct economic entity and a territory is not.").

San José's untimely re-definition of the relevant market fails to aid its case. Contrary to the market alleged in its Complaint, San José now adds that it suffered injury in the market for "the sale of land for the construction of a major league men's professional baseball stadium." SJ Op. Br. at 44. That argument is facially invalid under the antitrust laws. The Ninth Circuit requires that a relevant market for antitrust purposes "must encompass the product at issue as well as all economic substitutes for the product." *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1045 (9th Cir. 2008). But in San José's new proposed market, the "product" includes simply land. The products purportedly at issue—the provision of major league professional baseball contests and the sale of real estate—are not reasonably interchangeable, and thus the same market cannot encompass them.

Moreover, San José attempts to limit its new market to the sale of land to a particular kind of purchaser for a particular purpose—namely, the construction of a "major league . . . baseball stadium"—but the sale of land for a stadium is not economically distinct from the sale of land for other purposes.[20] Other circuits have routinely rejected efforts to limit the relevant market based upon the identity

---

[20] To be clear, San José does not contend it is a potential developer or owner of a stadium; in fact, it has vowed not to expend any public funds for, or directly participate in, the development of a stadium. II ER 219.

of the consumer.  For example, in *Chapman v. New York State Division for Youth*, the Second Circuit affirmed dismissal of an antitrust claim in which the plaintiff alleged a relevant market for "restraint training services to private child care providers."  546 F.3d 230, 238 (2d Cir. 2008).  The court explained that it was improper to limit the relevant market to services provided to "private child care providers" where there was no reason to conclude that such a market "is ***any different*** from the larger market for restraint training services to other businesses, agencies, and organizations."  *Id.* (emphasis added).  Here too, San José fails to explain how the market for "the sale of land for the construction of a major league men's professional baseball stadium" is ***any different*** from the larger market for land sales.  Because land sales for other purposes are reasonably interchangeable with land sales for the construction of a Major League men's professional baseball stadium, San José's market limitation must fail.  *Newcal Indus*, 513 F.3d at 1045 ("[A] complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable.").

The *Raiders* cases provide no support for San José's unduly restrictive market definition.  *See Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 726 F.2d 1381 (9th Cir. 1984) ("*Raiders I*"); 791 F.2d 1356 (9th Cir. 1986) ("*Raiders II*").  This Court concluded in *Raiders I* that there may be a distinct market for existing football stadia.  726 F.2d at 1393–94.  However, in

45

*Raiders II*, it refused to expand the holding of *Raiders I* to other entities that potentially might have entered into contracts with the team if it had relocated. *Raiders II*, 791 F.2d at 1365. "Football stadia constitute a special market," the Court reasoned, only because of "their indispensable and intimate connection with professional football and football teams." *Id*. San José has not alleged that the land subject to the Option Agreement has an "indispensable and intimate connection" with Major League Baseball. San José is merely a "part[y] who might have contracted with the [Athletics] had they not been restrained in their relocation plans" and therefore does not participate in a unique market and does not have standing. *Id*.

> ### c. San José's alleged injuries are not experienced in any cognizable market.

The third reason that San José has no antitrust injury is that it was not actually injured in the alleged relevant market. Antitrust injury requires that the plaintiff "suffer[] its injury ***in the market where competition is being restrained***. Parties whose injuries, though flowing from that which makes the defendant's conduct unlawful, are experienced in another market do not suffer antitrust injury." *Am. Ad Mgmt.*, 190 F.3d at 1057 (emphasis added). As discussed above, because San José is not a participant in the alleged market—"the provision of major league men's professional baseball contests" (II ER 69:13–14)—it could not suffer any injury in that market. And, because San José's alternative "market" for the sale of

land for the construction of ballparks is not a cognizable market under the antitrust laws, San José could not have experienced injuries in that market, either.

As it did below, San José resorts to the bare assertion that its "injuries are 'inextricably intertwined' with injuries sustained by the Athletics."  SJ Op. Br. at 45.  While it fails to offer any argument in support of this contention, San José apparently seeks to avail itself of a "narrow exception to the market participant requirement for parties whose injuries are 'inextricably intertwined' with the injuries of market participants."  *Am. Ad Mgmt.*, 190 F.3d at 1057 n.5.  Under this narrow doctrine, injuries may be "inextricably intertwined" with those of a market participant *only* when those injuries are the "very means by which [a defendant] sought to achieve its illegal ends."  *Blue Shield of Va. v. McCready*, 457 U.S. 465, 479 (1982).  But San José's Complaint provides no basis to apply the exception. San José has not alleged that MLB's actions caused harm to any cognizable market, let alone that any such harm actually injured San José.

###    2.    San José has not yet sustained damages, and, at best, claims an injury that results *indirectly* from the alleged antitrust violation.

The Ninth Circuit's second factor for assessing antitrust standing focuses on the *directness* and the *existence* of injuries.  "Injury that has not yet occurred," or that is "indirect," is "generally insufficient to give rise to standing under section 4 of the Clayton Act."  I ER 24:7–15 (D. Ct. Order).  As the District Court properly

held, San José does not have antitrust standing both because it has not yet sustained damages and because its claimed injury is indirect. *Id.*

### a.    San José has not yet sustained damages.

Section 4 of the Clayton Act does not allow a plaintiff to seek damages that have not yet been "sustained." 15 U.S.C. § 15(a) (allowing recovery to plaintiff based only on "damages by him sustained"); *Cargill*, 479 U.S. at 109–11; Areeda & Hovenkamp, Antitrust Law at ¶ 335a (2013). The District Court correctly held that San José has not suffered any damages and therefore does not have antitrust standing. I ER 24:7–15.

San José's damages theory, alleged throughout its Complaint, claimed that San José ***would have*** benefited from the diffuse economic impact of the Athletics' relocation, were it not for MLB's alleged conduct. For example, San José alleged that if MLB had approved the Athletics' relocation, the city's tax base would have increased, it would have collected more tax revenue, and, more broadly, its general economy would have benefited from stadium-related jobs. II ER 92–95. But, as the District Court correctly pointed out, the "alleged economic injury resulting from the A's not relocating to San José has not yet occurred and depends on an assumption that future events will take place, including that (1) the A's choose to make the move and exercise the Option Agreement; (2) the City can legally perform the Option Agreement; and (3) the A's can obtain financing, regulatory

approvals, and ultimately build the stadium." I ER 24:11–16. Those events and others have not occurred, and indeed might never occur, and therefore San José has not "sustained" damages and does not have antitrust standing.

San José now emphasizes an injury to its "commercial interests" in the downtown property that it wishes to sell to the Athletics. SJ Op. Br. at 47 (citing Option Agmt. at II ER 199). San José argues that it has "been prevented from entering into a purchase and sale agreement with the Athletics" as "a direct result of MLB's actions." SJ Op. Br. at 47. This new argument also fails. There "can be no antitrust injury if the plaintiff stands to gain from the alleged unlawful conduct." *Am. Ad. Mgmt.*, 190 F.3d at 1056. As explained above, San José would actually receive the full value of the land if the Athletics do not buy this property at its discounted price. Therefore, MLB's alleged interference with this sale under the Option Agreement could not result in antitrust injury to San José.

### b. San José's claimed injuries are "indirect" and "remote."

San José's claimed injuries are also ***indirect and remote***, and adjudicating them would force the court to trace long and convoluted chain-of-causation theories. Such indirect damages preclude antitrust standing. *Am. Ad. Mgmt.*, 190 F.3d at 1058 (a plaintiff must claim that he was injured as a "direct result" of the allegedly anticompetitive conduct).

Although an antitrust violation may "cause ripples of harm to flow through [an] economy," Congress did not intend to allow every person affected to maintain an action for treble damages. *Blue Shield*, 457 U.S. at 476–77. Instead, the courts recognize antitrust standing only if the asserted damages are ***close*** to the asserted violation in "the chain of causation." *Associated Gen. Contractors*, 459 U.S. at 540. Courts do not grant standing for remote harms because remote claims are simply too difficult to adjudicate. Remote claims make damages highly speculative (*id.* at 542), expand "the scope of complex antitrust trials" outside "judicially manageable limits" (*id.* at 543), and lead to burdensome and expensive discovery. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–59 (2007).

Many of San José's damages allegations are ***explicitly*** remote. For example, San José claims that if a stadium is built, and the Athletics relocate, the economy would grow and San José would indirectly enjoy some benefit from that growth in the form of increased tax receipts. II ER 92:1–7, 92:15–93:14. In this sense, San José's claim is no different than if hotels or local businesses claimed that they would have indirectly benefited from the Athletics' relocation. *Raiders II*, 791 F.2d 1356, 1365 (9th Cir. 1986) (no standing for hotels or limousine services that may be indirectly injured by "ripple effect" from franchise relocation); *cf. McCoy*, 911 F. Supp. at 458 (no standing for businesses near stadium claiming indirect injury due to cancelled games).

Other aspects of San José's damages claims lack any connection whatsoever to the alleged harm. For example, San José's Complaint alleges that a new stadium would create hundreds of new jobs, resulting in increased "total personal earnings" of its citizens. II ER 93:15–23. But San José has no standing to claim as damages the hypothetical "personal earnings" of its citizens.

### 3.     San José's claimed "harm" is completely speculative.

The Ninth Circuit's third factor for assessing antitrust standing focuses on whether the alleged "harm" is too speculative to support standing. *Associated Gen. Contractors*, 459 U.S. at 542. San José's "alleged economic injury" is its failure to secure a Major League Baseball club and all the associated economic benefits it believes would flow from the club. But that "alleged injury" will arise only if a series of highly contingent events all occur as San José wishes. For example, even if MLB approved the Athletics' relocation proposal:

1. the Athletics may not be able to afford the construction project;

2. the Athletics may choose a different stadium location;

3. the Option Agreement may be invalidated if San José violated CEQA, did not obtain public approval, or violated a local ordinance barring stadium projects;[21]

---

[21] *See Stand For San José v. City of San José*, No. 1-11-CV-214196 (Cal. Super. Ct. filed Dec. 2, 2011), No. 1-13-CV-250372 (filed July 30, 2013). II ER 7:26–8:5; 80 (¶ 80). *See also* MLB's Motion to Take Judicial Notice, Ex. 2 at ¶ 1.

4. the Athletics may not be able to purchase the *other* land necessary to complete the required stadium site;[22] and so on.

San José needs all of these contingent events, and more, to fall into place before it can claim that MLB's alleged actions caused an injury. No standing exists "where any possible injury to the plaintiff [is] contingent on several events which may or may not happen." *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 522 F.3d 6, 15 (1st Cir. 2008) (quotation marks and citation omitted).

### 4. San José's claimed damages are potentially duplicative and subject to complex apportionment.

The Ninth Circuit's fourth and fifth factors—"the risk of duplicative recovery" and "the complexity in apportioning damages"—also weigh in favor of MLB. *Am. Ad Mgmt.*, 190 F.3d at 1054.

If San José were permitted "to recover damages for injury to its general economy, [the court] would open the door to duplicative recoveries." *Hawaii*, 405 U.S. at 263–64. As the Supreme Court has recognized, "[e]ven the most lengthy and expensive trial could not, in the final analysis, cope with the problems of double recovery." *Id.* at 264.

In addition, measuring injury to the general economy would be "extremely difficult" and would "necessarily involve[] an examination of the impact of a

---

[22] The Athletics would need to purchase many additional parcels in order to build a ballpark on the proposed site. *See* I ER 252–53.

restraint of trade upon every variable that affects the [city's] economic health." *Id.*

at 264 n.14.  A plaintiff is not entitled to damages based on "speculation or

guesswork." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 264–66 (1946).

Antitrust standing does not lie where a plaintiff, like San José, claims "massive and

complex damages" that threaten to "burden[] the courts" and "undermine[] the

effectiveness of treble-damages suits." *Associated Gen. Contractors*, 459 U.S. at

545.  As soon as "it appears that the plaintiff has not offered reasonable proof of

the amount of legitimate damages, the appropriate course is generally to dismiss

the complaint."  Areeda & Hovenkamp, Antitrust Law at ¶ 340 (2013).

San José also has failed to offer a reasonably quantifiable method of

calculating its damages.  Instead, it would ask the District Court to evaluate

complex economic and social models for how a new stadium might hypothetically

affect the local economy (and indirectly benefit the city).  For example, San José

seeks damages for:

- "direct spending" in the local economy from ticket revenue, concessions, lodging, restaurants, and retail (II ER 92, II ER 139–43);

- "personal earnings generated by the jobs created as a result of the ballpark" (II ER 93, II ER 145–47);

- sales taxes, property taxes, and school-district taxes accruing from a hypothetically increased tax base (II ER 92–93, II ER 152–57); and

- "new economic output" (calculated by multiplying estimated "net new direct spending" by an estimated "economic multiplier") (II ER 92, II ER 144).

In sum, San José uses speculative 30-year and 50-year models of the local economy to seek billions of dollars of damages, all before trebling. This sort of "Economic Impact Analysis" may be appropriate for municipal planning and decisionmaking, but it is far too speculative and judicially unmanageable to create standing for a multi-billion dollar antitrust claim. *See, e.g., Associated Gen. Contractors*, 459 U.S. at 545.

San José therefore lacks standing under § 4 of the Clayton Act.

## B.     San José also lacks standing to seek equitable relief under § 16 of the Clayton Act.

Section 16 of the Clayton Act allows private plaintiffs to bring equitable claims for "threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. To maintain an action for an injunction under § 16, "a private plaintiff must generally meet all the requirements that apply to the damages plaintiff, except that the injury itself need only be threatened, damage need not be quantified, and occasionally a party too remote for damages might be granted an injunction." *Lucas Auto. Eng'g v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1234 (9th Cir. 1998). San José cannot establish even ***threatened*** antitrust injury, and the injury it alleges is indirect, speculative, and not proximately caused by MLB's allegedly wrongful conduct. Therefore, San José lacks standing under § 16 of the Clayton Act.

812213

**1.    San José cannot show a threatened antitrust injury.**

Although a plaintiff seeking injunctive relief need not show that it has already "sustained" damages, the plaintiff must *still* show a threatened *antitrust injury*—an injury "of the type the antitrust laws were designed to prevent." *Cargill*, 479 U.S. at 113.  San José thus lacks § 16 standing for many of the same reasons described above in section III.A.1.  San José is not a participant in the alleged relevant market—"the provision of major league men's professional baseball contests."  II ER 69:13–14.  And, San José has not alleged that MLB's actions caused harm to that identified market, or that any harm in the market for "major league men's professional baseball contests" would actually injure San José.  San José, therefore, cannot make the required showing of a threatened antitrust injury.

**2.    San José cannot show that its claimed injury would result proximately from MLB's allegedly wrongful acts.**

As explained above, San José's claimed injury is indirect and speculative. *City of Rohnert Park v. Harris*, 601 F.2d 1040, 1045 (9th Cir. 1979) (the "question whether these appellants would have benefited but for appellees' actions is entirely speculative.").  The Athletics' ability to relocate to San José is far from certain and would depend on a string of yet-to-occur events, making San José's claimed injury nothing more than an economic "ripple" that is not certain, or even plausible, and

which may be frustrated by any number of intervening causes.[23]  For example, as described above, the project may run into the sort of financing and regulatory problems that scuttle many large-scale development projects.  Or, the California Superior Court may invalidate the Option Agreement.[24]  Cal. Health & Safety Code § 34167.5.

Finally, San José now appears to proceed solely on a claim that MLB threatens San José's commercial interest in "sell[ing], leas[ing], or otherwise dispos[ing]" of the land subject to the Option Agreement.  SJ Op. Br. at 49.  This theory too fails to show proximate cause.  *First*, what San José bargained for and

---

[23] While the District Court below did not reach a conclusion with respect to San José's § 16 claim, it distinguished this case from *Rohnert Park* because "the A's have already selected the Diridon land as the prospective site for a new stadium."  I ER 25:12–17.  This distinction does not take into account the full record.  Even if Major League Baseball were not exempt from the antitrust laws, it would still be permitted, like other sports leagues, to have and apply relocation rules.  *See Nat'l Basketball Ass'n v. SDC Basketball Club, Inc.*, 815 F.2d 562, 568 (9th Cir. 1987) ("[A] careful analysis of *Raiders I* makes it clear that franchise movement restrictions are not invalid as a matter of law.").  The Athletics, therefore, do not have the ability unilaterally to "select" San José as their new location.  I ER 61–62 (Art. V, § 2(b)(3)).

[24] In *Stand for San José, et al. v. City of San José*, Case Nos. 111-cv-214196 and 113-cv-250372, two cases pending before the California Superior Court for Santa Clara County, the petitioner alleges, among other grounds upon which the Option Agreement may be legally invalid: (1) the Option Agreement was predicated upon a defective Environmental Impact Report that failed to comply with the requirements of CEQA; (2) the City's failure to conduct a public vote prior to entering into the Option Agreement violated San José Municipal Code 4.95.010; and (3) the City violated Code of Civil Procedure § 526a by the illegal expenditure of public funds for the stadium project.  II ER 7:26–8:5; 80 (¶ 80).  *See also* MLB's Motion to Take Judicial Notice, Ex. 2 at ¶ 1.

56

entered into is an **option** agreement.  The Athletics hold the option, and the city is not entitled to demand that it be exercised.  *Second,* if San José's sole "commercial interest" is in the value of this property, it can sell the land to anyone.  These parcels were originally purchased for $25.16 million, they have a book value of $26.1 million, and if San José "successfully" executes a sale to the Athletics, San José would receive a paltry $6.975 million.  I ER 233, I ER 246.  MLB's alleged actions do not threaten **injury**; instead, they promise a direct economic benefit for the City of San José.

Since San José's claims of "threatened" injury are just as uncertain, indirect, and speculative as its claims for damages, San José also does not have antitrust standing to pursue injunctive relief.[25]

## IV.    CONCLUSION

For the foregoing reasons, the District Court's decision should be affirmed.

---

[25] San José also purports to bring this action "on behalf of the People of the City of San José." II ER 67–68.  But under the express terms of the Clayton Act, only the State of California can bring *parens patriae* actions.  15 U.S.C. § 15c; *see also Rohnert Park*, 601 F.2d at 1044 (holding that cities do not have standing to assert antitrust claims "on behalf of [their] property owners, taxpayers, and inhabitants.").

57

Respectfully submitted,

Dated:  April 4, 2014                              **KEKER & VAN NEST LLP**


                                        By:    /s/ John W. Keker
                                                JOHN W. KEKER
                                                PAULA L. BLIZZARD
                                                R. ADAM LAURIDSEN
                                                THOMAS E. GORMAN

                                                **PROSKAUER ROSE LLP**
                                                BRADLEY I. RUSKIN
                                                SCOTT P. COOPER
                                                SARAH KROLL-ROSENBAUM
                                                JENNIFER L. ROCHE
                                                SHAWN S. LEDINGHAM, JR.

                                                Attorneys for Defendants /Appellees
                                                OFFICE OF THE COMMISSIONER
                                                OF BASEBALL,
                                                an unincorporated association doing
                                                business as Major League
                                                Baseball; and ALLAN HUBER
                                                "BUD" SELIG

## CERTIFICATE OF COUNSEL REGARDING RELATED CASES

Under Circuit Rule 28-2.6, Defendants Office of the Commissioner of

Baseball and Allan Huber "Bud" Selig, by and through their counsel of record,

hereby certify that they are not aware of any related cases pending in this Court.


Dated:  April 4, 2014                    **KEKER & VAN NEST LLP**


                                    By:    /s/ John W. Keker
                                            JOHN W. KEKER
                                            PAULA L. BLIZZARD
                                            R. ADAM LAURIDSEN
                                            THOMAS E. GORMAN

                                            **PROSKAUER ROSE LLP**
                                            BRADLEY I. RUSKIN
                                            SCOTT P. COOPER
                                            SARAH KROLL-ROSENBAUM
                                            JENNIFER L. ROCHE
                                            SHAWN S. LEDINGHAM, JR.

                                            Attorneys for Defendants /Appellees
                                            OFFICE OF THE COMMISSIONER
                                            OF BASEBALL,
                                            an unincorporated association doing
                                            business as Major League
                                            Baseball; and ALLAN HUBER
                                            "BUD" SELIG

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,530 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface—14 point Times New Roman—using Microsoft Word 2010.

Dated: April 4, 2014                          **KEKER & VAN NEST LLP**


By:    /s/ John W. Keker
      JOHN W. KEKER
      PAULA L. BLIZZARD
      R. ADAM LAURIDSEN
      THOMAS E. GORMAN

      **PROSKAUER ROSE LLP**
      BRADLEY I. RUSKIN
      SCOTT P. COOPER
      SARAH KROLL-ROSENBAUM
      JENNIFER L. ROCHE
      SHAWN S. LEDINGHAM, JR.

      Attorneys for Defendants /Appellees
      OFFICE OF THE COMMISSIONER
      OF BASEBALL,
      an unincorporated association doing
      business as Major League
      Baseball; and ALLAN HUBER
      "BUD" SELIG

812213

# STATUTORY AND LEGISLATIVE ADDENDUM

## Table of Contents

Clayton Act § 4, codified at 15 U.S.C. § 15 ...........................................................62

Clayton Act § 16, codified at 15 U.S.C. § 26 .........................................................62

Curt Flood Act, codified at 15 U.S.C. § 26b .........................................................63

Congressional Hearings on Baseball's Antitrust Exemption since 1972 ...............66

812213

**Clayton Act § 4, codified at 15 U.S.C. § 15**

§ 15. Suits by persons injured.

(a) Amount of recovery; prejudgment interest

Except as provided in subsection (b) of this section, any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee. . . .

**Clayton Act § 16, codified at 15 U.S.C. § 26**

§ 26. Injunctive relief for private parties; exception; costs

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue. . . .

812213

**Curt Flood Act, codified at 15 U.S.C. § 26b**

§ 26b. Application of the antitrust laws to professional major league baseball.

(a) Major league baseball subject to antitrust laws

Subject to subsections (b) through (d) of this section, the conduct, acts, practices, or agreements of persons in the business of organized professional major league baseball directly relating to or affecting employment of major league baseball players to play baseball at the major league level are subject to the antitrust laws to the same extent such conduct, acts, practices, or agreements would be subject to the antitrust laws if engaged in by persons in any other professional sports business affecting interstate commerce.

(b) Limitation of section

No court shall rely on the enactment of this section as a basis for changing the application of the antitrust laws to any conduct, acts, practices, or agreements other than those set forth in subsection (a) of this section. this section does not create, permit or imply a cause of action by which to challenge under the antitrust laws, or otherwise apply the antitrust laws to, any conduct, acts, practices, or agreements that do not directly relate to or affect employment of major league baseball players to play baseball at the major league level, including but not limited to

(1) any conduct, acts, practices, or agreements of persons engaging in, conducting or participating in the business of organized professional baseball relating to or affecting employment to play baseball at the minor league level, any organized professional baseball amateur or first-year player draft, or any reserve clause as applied to minor league players;

(2) the agreement between organized professional major league baseball teams and the teams of the National Association of Professional Baseball Leagues, commonly known as the "Professional Baseball Agreement", the relationship between organized professional major league baseball and organized professional minor league baseball, or any other matter relating to organized professional baseball's minor leagues;

(3) any conduct, acts, practices, or agreements of persons engaging in, conducting or participating in the business of organized professional baseball relating to or affecting franchise expansion, location or relocation, franchise ownership issues, including ownership transfers, the relationship

63

between the Office of the Commissioner and franchise owners, the marketing or sales of the entertainment product of organized professional baseball and the licensing of intellectual property rights owned or held by organized professional baseball teams individually or collectively;

(4) any conduct, acts, practices, or agreements protected by Public Law 87-331 (15 U.S.C. 1291 et seq.) (commonly known as the "Sports Broadcasting Act of 1961");

(5) the relationship between persons in the business of organized professional baseball and umpires or other individuals who are employed in the business of organized professional baseball by such persons; or

(6) any conduct, acts, practices, or agreements of persons not in the business of organized professional major league baseball.

(c) Standing to sue

Only a major league baseball player has standing to sue under this section. For the purposes of this section, a major league baseball player is—

(1) a person who is a party to a major league player's contract, or is playing baseball at the major league level; or

(2) a person who was a party to a major league player's contract or playing baseball at the major league level at the time of the injury that is the subject of the complaint; or

(3) a person who has been a party to a major league player's contract or who has played baseball at the major league level, and who claims he has been injured in his efforts to secure a subsequent major league player's contract by an alleged violation of the antitrust laws: Provided however, That for the purposes of this paragraph, the alleged antitrust violation shall not include any conduct, acts, practices, or agreements of persons in the business of organized professional baseball relating to or affecting employment to play baseball at the minor league level, including any organized professional baseball amateur or first-year player draft, or any reserve clause as applied to minor league players; or

(4) a person who was a party to a major league player's contract or who was playing baseball at the major league level at the conclusion of the last full championship season immediately preceding the expiration of the last

collective bargaining agreement between persons in the business of organized professional major league baseball and the exclusive collective bargaining representative of major league baseball players.

(d) Conduct, acts, practices, or agreements subject to antitrust laws

(1) As used in this section, "person" means any entity, including an individual, partnership, corporation, trust or unincorporated association or any combination or association thereof. As used in this section, the National Association of Professional Baseball Leagues, its member leagues and the clubs of those leagues, are not "in the business of organized professional major league baseball".

(2) In cases involving conduct, acts, practices, or agreements that directly relate to or affect both employment of major league baseball players to play baseball at the major league level and also relate to or affect any other aspect of organized professional baseball, including but not limited to employment to play baseball at the minor league level and the other areas set forth in subsection (b) of this section, only those components, portions or aspects of such conduct, acts, practices, or agreements that directly relate to or affect employment of major league players to play baseball at the major league level may be challenged under subsection (a) of this section and then only to the extent that they directly relate to or affect employment of major league baseball players to play baseball at the major league level.

(3) As used in subsection (a) of this section, interpretation of the term "directly" shall not be governed by any interpretation of section 151 et seq. of Title 29 (as amended).

(4) Nothing in this section shall be construed to affect the application to organized professional baseball of the nonstatutory labor exemption from the antitrust laws.

(5) The scope of the conduct, acts, practices, or agreements covered by subsection (b) of this section shall not be strictly or narrowly construed.

## Congressional Hearings on Baseball's Antitrust Exemption since 1972

1. *Professional Sports Blackouts:  Hearing Before the H. Comm. on Interstate and Foreign Commerce, Subcomm. on Communications and Power,* 93rd Cong., 1st Sess. (1973).

2. *Rights of Professional Athletes:  Hearing Before the H. Comm. on the Judiciary*, *Subcomm. on Monopolies and Commercial Law*, 94th Cong., 1st Sess. (1975).

3. *Professional Sports and the Law:  Hearing Before the H. Comm. on Professional Sports*, 94th Cong., 2d Sess. (1976).

4. *Inquiry into Professional Sports:  Hearing Before the H. Comm. on Professional Sports*, 94th Cong., 2d Sess. (1976).

5. *Inquiry into Professional Sports:  Hearing Before the H. Comm. on Professional Sports*, 94th Cong., 2d Sess. (1976).

6. *Rights of Professional Athletes:  Hearing Before the H. Comm. on the Judiciary, Subcomm. on Monopolies and Commercial Law*, 95th Cong., 1st Sess. (1977).

7. *Sports Anti-blackout Legislation:  Hearing Before the H. Comm. on Interstate and Foreign Commerce, Subcomm. on Communications*, 95th Cong., 2d Sess. (1978).

8. *Sports Anti-blackout Legislation:  Hearing Before the H. Comm. on Interstate and Foreign Commerce, Subcomm. on Communications and Power*, 96th Cong., 1st Sess. (1979).

9. *Antitrust Policy and Professional Sports:  Hearing Before the H. Comm. on the Judiciary, Subcomm. on Monopolies and Commercial Law*, 97th Cong., 1st & 2d Sess. (1981).

10. *Antitrust Policy and Professional Sports:  Hearing Before the H. Comm. on the Judiciary, Subcomm. on Monopolies and Commercial Law*, 97th Cong., 1st & 2d Sess. (1982).

11. *Professional Sports Antitrust Immunity:  Hearing Before the Sen. Comm. on the Judiciary*, 97th Cong., 2d Sess. (1982).

812213

12. *Professional Sports Antitrust Immunity:  Hearing Before the Sen. Comm. on the Judiciary*, 98th Cong., 1st Sess. (1983).

13. *Professional Sports Team Community Protection Act:  Hearing Before the H. Comm. on Energy and Commerce, Subcomm. on Commerce, Transportation, and Tourism*, 98th Cong., 2d Sess. (1984).

14. *Professional Sports Team Community Protection Act:  Hearing Before the Sen. Comm. on Commerce, Science, and Transportation*, 98th Cong., 2d Sess. (1984).

15. *Professional Sports:  Hearing Before the H. Comm. on Energy and Commerce, Subcomm. on Commerce, Transportation, and Tourism*, 99th Cong., 1st Sess. (1985).

16. *Professional Sports Antitrust Immunity:  Hearing Before the Sen. Comm. on the Judiciary*, 99th Cong., 1st Sess. (1985).

17. *Professional Sports Community Protection Act of 1985:  Hearing Before the Sen. Comm. on Commerce, Science, and Transportation*, 99th Cong., 1st Sess. (1985).

18. *Professional Sports Antitrust Immunity:  Hearing Before the Sen. Comm. on the Judiciary*, 99th Cong., 2d Sess. (1986).

19. *Antitrust Implications of the Recent NFL Television Contract:  Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Monopolies, and Business Rights*, 100th Cong., 1st Sess. (1987).

20. *Professional Sports Antitrust Immunity:  Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Monopolies, and Business Rights*, 100th Cong., 2d Sess. (1988).

21. *Competitive Issues in the Cable Television Industry:  Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Monopolies, and Business Rights*, 100th Cong., 2d Sess. (1988).

22. *Sports Programming and Cable Television:  Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Monopolies, and Business Rights*, 101st Cong., 1st Sess. (1989).

23. *Competitive Problems in the Cable Television Industry:  Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Monopolies, and Business Rights*, 101st Cong., 1st Sess. (1990).

24. *Cable Television Regulation (Part 2):  Hearing Before the H. Comm. on Energy and Commerce, Subcomm. on Telecommunications and Finance*, 101st Cong., 2d Sess. (1990).

25. *Sports Programming and Cable Television:  Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Monopolies, and Business Rights*, 101st Cong., 2d Sess. (1991).

26. *Prohibiting State-Sanctioned Sports Gambling:  Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Patents, Copyrights, and Trademarks*, 102nd Cong., 1st Sess. (1991).

27. *Baseball's Antitrust Immunity:  Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Monopolies, and Business Rights*, 102nd Cong., 2d Sess. (1992).

28. *Baseball's Antitrust Immunity:  Hearing Before the H. Comm. on the Judiciary, Subcomm. on Economic and Commercial Law*, 103rd Cong., 1st Sess. (1993).

29. *Key Issues Confronting Minor League Baseball:  Hearing Before the H. Comm. on Small Business*, 103rd Cong., 2d Sess. (1994).

30. *Baseball's Antitrust Exemption (Part 2):  Hearing Before the H. Comm. on the Judiciary, Subcomm. on Economic and Commercial Law*, 103rd Cong., 2d Sess. (1994).

31. *Impact on Collective Bargaining of the Antitrust Exemption, Major League Play Ball Act of 1995:  Hearing Before the H. Comm. on Education and Labor, Subcomm. on Labor-Management Relations*, 103rd Cong., 2d Sess. (1994).

32. *Professional Baseball Teams and the Anti-trust Laws:  Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Monopolies, and Business Rights*, 103rd Cong., 2d Sess. (1994).

812213

33. *The Court-Imposed Major League Baseball Antitrust Exemption:  Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Business Rights, and Competition*, 104th Cong., 1st Sess. (1995).

34. *Antitrust Issues in Relocation of Professional Sports Franchises:  Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Business Rights, and Competition*, 104th Cong., 1st Sess. (1995).

35. *The Court-Imposed Major League Baseball Antitrust Exemption:  Hearing Before the Sen. Comm. on Antitrust, Business Rights, and Competition*, 104th Cong., 1st Sess. (1995).

36. *Professional Sports Franchise Relocation:  Hearing Before the H. Comm. on the Judiciary*, 104th Cong., 2d Sess. (1996).

37. *Professional Sports:  The Challenges Facing the Future of the Industry: Hearing Before the Sen. Comm. on the Judiciary*, 104th Cong., 2d Sess. (1996).

38. *Major League Baseball Reform Act of 1995:  Hearing Before the Sen. Comm. on the Judiciary*, 104th Cong., 2d Sess. (1996).

39. *Major League Baseball Antitrust Reform:  Hearing Before the Sen. Comm. on the Judiciary*, 105th Cong., 1st Sess. (1997).

40. *Stadium Financing and Franchise Relocation Act of 1999: Hearing Before the Sen. Comm. on the Judiciary*, 106th Cong., 1st Sess. (1999).

41. *Baseball's Revenue Gap: Pennant for Sale?: Hearing Before the Sen. Comm. on the Judiciary*, 106th Cong., 2d Sess. (2000).

42. *Fairness in Antitrust in National Sports (Fans) Act of 2001:  Hearing Before the H. Comm. on the Judiciary*, 107th Cong., 1st Sess. (2001).

43. *The Application of Federal Antitrust Laws to Major League Baseball: Hearing Before the Sen. Comm. on the Judiciary*, 107th Cong., 2d Sess. (2002).

44. *Out at Home: Why Most Nats Fans Can't See Their Team on TV: Hearing Before the H. Comm. on Gov't Reform*, 109th Cong., 2d Sess. (2006).

45. *Exclusive Sports Programming: Examining Competition and Consumer Choice: Hearing Before the Sen. Comm. on Commerce, Science and Transportation, 110th Cong.*, 1st Sess. (2007).

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ John W. Keker
John W. Keker

71

812213